Harold Noel ARROWSMITH, Jr.,
Plaintiff-Appellant,

v.

UNITED PRESS INTERNATIONAL,
Defendant-Appellee.

No. 73, Docket 27641.

United States Court of Appeals
Second Circuit.

Argued Oct. 29, 1962.

Decided June 11, 1963.

Cornelius J. Barry, Jr., Valley Stream, N. Y. (Harold Noel Arrowsmith, Jr., pro se, on the brief), for plaintiff-appellant.

James L. Oakes (of Gannett, Oakes & Weber), Brattleboro, Vt., for defendant-appellee.

Before LUMBARD, Chief Judge, and CLARK, WATERMAN, MOORE, FRIENDLY, SMITH, KAUFMAN, HAYS and MARSHALL, Circuit Judges.

FRIENDLY, Circuit Judge.

On October 13, 1961, plaintiff, a resident of Maryland, brought this action for libel against United Press International (hereafter UPI), a New York corporation, in the District Court for Vermont. He alleged that a news dispatch, transmitted by defendant on October 17, 1958, under an Atlanta, Georgia, dateline, which reported the dynamiting of an Atlanta synagogue, contained a defamatory reference to him as a " 'fat cat' financier" of anti-Semitic terrorist activity.[1] The complaint did not allege that

1. The dispatch read as follows:

"Atlanta—(UPI)—Five persons were indicted today in connection with the dynamiting of the Jewish Temple here.

"The grand jury handed down indictments against the quintet that could possibly send them to the electric chair on charges of dynamiting of the house of worship on famed Peachtree Street last Sunday.

"An Atlanta detective working on the case disclosed meanwhile that the identity is known of a so-called 'fat-cat' financier of such terrorist activity as the temple bombing.

"Most investigators believe the bombing was part of an interstate, or possibly international, conspiracy.

"Detective Capt. R. E. Little, Jr., said he 'definitely' knows the identity of a person referred to in a confiscated letter as the 'fat cat' financier who, the writer said, 'is putting his $ $ $ where his mouth is, God bless him.' The Arlington, Va., Sun said he is a resident of Baltimore.

"Police released the text of a letter that spoke of the 'fat cat' financier.

"The Associated Press said an Arlington printer (George Lincoln Rockwell) who turns out anti-Jewish literature acknowledged today he wrote a letter which has figured in the bombing of a Jewish Temple in Atlanta.

"Rockwell said the letter was written last July to Wallace H. Allen in Atlanta.

"FBI agents interviewed Rockwell but the FBI declined to disclose the outcome.

"It was learned in Washington that the FBI Thursday questioned Rockwell and Harold Noel Arrowsmith, Jr., described as a member of a wealthy Baltimore family.

"Authorities today sought a mystery figure thought to be the mastermind of dynamitings in the South.

"Further evidence of the 'fat cat's' role was reported by police in a letter containing this line: 'The big blast is all set for either next Sunday or Saturday * * * we will know tomorrow and will keep you informed.'"

the dispatch was printed or broadcast in Vermont, although we do read it as alleging the transmission of the dispatch to UPI's subscribers there. Neither did the complaint allege that Arrowsmith was known to anyone in Vermont, that he had any "reputation" in that state, or that such "publication" as occurred in Vermont resulted in any injury to him in any state where he did have a reputation. The complaint sought "general damages" of $56,280,000, a sum calculated at $10,000 for each of UPI's 5,628 subscribers in the United States and foreign countries. Although the record does not reveal why the action was brought in Vermont, a quite sufficient explanation can be perceived by taking appropriate account of the dates recited in the first two sentences of this opinion, of Vermont's three-year statute of limitations for libel, 12 V.S.A. § 512(3), and of the much shorter ones of other states.[2]

UPI moved under F.R.Civ.Proc. 12(b) to dismiss on various grounds, including lack of personal jurisdiction, improper venue, and failure of the complaint (primarily because it alleged no special damages) to state a claim upon which relief could be granted. Judge Gibson sustained the last mentioned ground; he did not pass on the first two. 205 F.Supp. 56 (D.Vt.1962). Plaintiff appeals from the judgment of dismissal.

We all agree it was error for the district court to proceed as it did. Not only does logic compel initial consideration of the issue of jurisdiction over the defendant—a court without such jurisdiction lacks power to dismiss a complaint for failure to state a claim—but the functional difference that flows from the ground selected for dismissal likewise compels considering jurisdiction and venue questions first. A dismissal for lack of jurisdiction or improper venue does not preclude a subsequent action in an appropriate forum, whereas a dismissal for failure to state a claim upon which relief can be granted is with prejudice. We shall therefore vacate the judgment dismissing the complaint for failure to state a claim on which relief can be granted and remand the case for consideration of the issue of jurisdiction over the person of the defendant and, in the event that this be found, the issue of venue, prior to consideration of the merits.[3] In so remanding it is incumbent on us to decide what standard should govern the judge's determination as to the jurisdiction of the District Court for Vermont over the person of the foreign corporation defendant—in particular, whether a "state" or a "federal" standard should here be applied. A summary will provide the needed background.

The affidavits submitted by UPI. on the motion to dismiss showed the follow-

---

2. Thus, New York, where defendant is incorporated and whence the libel was allegedly transmitted to Vermont, Georgia, where the libel originated, and Maryland, where plaintiff resides, all have one-year statutes of limitations for defamation. N.Y.Civil Practice Act § 51–3; Book 2, Tit. 3 Ga.Code Ann. § 1004; 57 Md.Code Ann. § 1. Defendant asserted at the argument that the only states with periods of limitation as long as three years were Vermont and Arkansas. A suit brought by plaintiff against defendant in federal court in Arkansas, where defendant's activities are considerably more extensive than in Vermont, was dismissed for want of jurisdiction by the District Court for the Eastern District of Arkansas, No. LR–61–C–160, and we are told that plaintiff's appeal from this order was dismissed on April 30, 1962. It appears that two other states,

Hawaii and New Mexico, even more remote from the *locus* of the present claim, have limitation periods of three years or longer for libel actions. Hawaii Rev. Laws § 241–1(e); N.M.Stats.Ann. § 23–1–8.

3. If the district court should find it necessary again to consider the sufficiency of the complaint, it ought consider not simply Vermont internal law but the law or laws that a Vermont court would apply under applicable choice of law rules. See Hartmann v. Time, Inc., 166 F.2d 127, 133 (3 Cir. 1947), cert. denied, 334 U.S. 838, 68 S.Ct. 1495, 92 L.Ed. 1763 (1948); Brewster v. Boston Herald Traveler Corp., 188 F.Supp. 565, 569, 577 (D. Mass.1960), 74 Harv.L.Rev. 1457 (1961); Prosser, Interstate Publication, 51 Mich. L.Rev. 959, 971–78 (1953).

ing facts relevant to the issues of jurisdiction and venue: UPI has eleven subscribers in Vermont (two newspapers, eight radio stations, and one radio-television station) to which it transmits news and news pictures over circuits leased from the Bell System, which owns all the equipment save for teletypewriters in the subscribers' premises, these being owned by UPI. UPI has one employee in Vermont, Isabelle McCaig, who is the "manager" of its Montpelier "news bureau" and upon whom service of process was made. UPI has no office in Vermont; Miss McCaig occupies desk space in a general news room in the State House in Montpelier. There she "punches out" Vermont news stories on a wire leading to UPI's Boston office, where her transmittals are rewritten, as well as to the nine broadcast subscribers in Vermont and fourteen in New Hampshire. With the exception of the dispatches received over this wire, all of UPI's transmissions to its Vermont subscribers originate outside the state, as was true of the allegedly libelous dispatch here. UPI's gross billings to its Vermont subscribers in 1960 represented less than 0.14% of its total gross billings to subscribers in the United States and foreign countries. Plaintiff's affidavit added nothing significant to his complaint; he indicated that he expected to be able to prove the transmission of the offending dispatch to some of UPI's Vermont subscribers, but said nothing as to its use by them or as to any injury suffered by him in Vermont or elsewhere as a result of the "publication" there.

## I.

The issue of the standard to be applied in determining whether a federal court has jurisdiction over the person of a foreign corporation in a suit where federal jurisdiction is founded solely on diversity of citizenship, 28 U.S.C. § 1332, has arisen frequently since the late Judge Goodrich's penetrating opinion, written for the First Circuit and concurred in by Judges Magruder and Woodbury, in Pulson v. American Rolling Mill Co., 1 Cir., 170 F.2d 193 (1948). He analyzed the problem as follows:

"There are two parts to the question whether a foreign corporation can be held subject to suit within a state. The first is a question of state law: has the state provided for bringing the foreign corporation into its courts under the circumstances of the case presented? There is nothing to compel a state to exercise jurisdiction over a foreign corporation unless it chooses to do so, and the extent to which it so chooses is a matter for the law of the state as made by its legislature. If the state has purported to exercise jurisdiction over the foreign corporation, then the question may arise whether such attempt violates the due process clause or the interstate commerce clause of the federal constitution. Const. art. 1, § 8, cl. 3; Amend. 14. This is a federal question and, of course, the state authorities are not controlling. But it is a question which is not reached for decision until it is found that the State statute is broad enough to assert jurisdiction over the defendant in a particular situation."

Finding that the Massachusetts statute as interpreted by the Supreme Judicial Court did not purport to subject the defendant to suit in Massachusetts, the court affirmed Judge Wyzanski's dismissal of the suit, saying "we have no occasion to discuss how far recent decisions might allow a state to go in extending its jurisdiction in this field."

This conclusion, that a federal district court will not assert jurisdiction over a foreign corporation in an ordinary diversity case unless that would be done by the state court under constitutionally valid state legislation in the state where the court sits, has been reached in almost every circuit that has considered the issue:

*First*: Pulson v. American Rolling Mill Co., supra; Waltham Precision Instr. Co. v. McDonnell Air-

craft Corp., 310 F.2d 20 (1 Cir. 1962);

*Third*: Partin v. Michaels **Art** Bronze Co., 202 F.2d 541, 542 (3 Cir. 1953) ("So the first question which comes up in a case like the one at issue is whether the State, here Pennsylvania, has, through legislation plus the judicial application thereof, asserted jurisdiction over the defendant");

*Fourth*: Easterling **v.** Cooper Motors, Inc., 26 F.R.D. 1, 2 (M.D. N.C.1960) ("There are two relevant North Carolina statutes dealing with jurisdiction over foreign corporations. * * * If service of process is to be sustained in this case, it must be under one of these statutes");

*Fifth*: Stanga v. McCormick Shipping Corp., 268 F.2d 544, 548 (5 Cir. 1959) ("The first part is to ascertain whether the state law means to encompass the challenged service. This question—at least as to diversity cases [of] which this is one—is wholly a matter of state law"); New York Times Co. v. Conner, 291 F.2d 492 (5 Cir. 1961), judgment vacated on the basis of a changed view of state law, 310 F.2d 133 (5 Cir. 1962);

*Seventh*: Canvas Fabricators, Inc. v. William E. Hooper & Sons Co., 199 F.2d 485, 486 (7 Cir. 1952) ("The primary contested issue is whether defendant was 'doing business' in the State of Illinois so as to be amenable to local process * * *. This being a diversity case, it can hardly be doubted but that the main question for decision is controlled by local law"); Rensing v. Turner Aviation Corp., 166 F.Supp. 790, 796 (N. D.Ill.1958); National Gas Appliance Corp. v. AB Electrolux, 270 F.2d 472, 475 (7 Cir. 1959), cert. denied, 361 U.S. 959, 80 S.Ct. 584, 4 L.Ed.

2d 542 (1960); Green v. Robertshaw-Fulton Controls Co., 204 F. Supp. 117, 127–128 and n. 9 (S.D. Ind.1962);

*Eighth*: Charles Keeshin, Inc. v. Gordon Johnson Co., 109 F.Supp. 939 (W.D.Ark.1952); Hilmes v. Marlin Firearms Co., 136 F.Supp. 307–308 (D.Minn.1955) ("where jurisdiction in a case is based solely upon diversity of citizenship, the power of the federal district court to entertain the case is dependent upon whether the case could have been brought in the state court of the state in which the federal district court is located"); see Electrical Equipment Co. v. Daniel Hamm Drayage Co., 217 F. 2d 656, 661 (8 Cir. 1954);

*Ninth*: Kenny v. Alaska Airlines, Inc., 132 F.Supp. 838, 842–849 (S.D. Cal.1955) ("Our first reference then in determining the 'doing business' question, must be to the law as declared by the legislature and courts of the state of California"); Kesler v. Schetky Equipment Corp., 200 F. Supp. 678 (N.D.Cal.1961), citing L. D. Reeder Contractors of Arizona v. Higgins Industries, Inc., 265 F.2d 768, 776–79 (9 Cir. 1959);

*Tenth*: Steinway v. Majestic Amusement Co., 179 F.2d 681, 684 (10 Cir. 1949), cert. denied, 339 U.S. 947, 70 S.Ct. 802, 94 L.Ed. 1362 (1950) ("we know that the Oklahoma courts have not gone so far [as the 14th Amendment permits], and we cannot now forecast that they will").

There thus exists an overwhelming consensus that the amenability of a foreign corporation to suit in a federal court in a diversity action is determined in accordance with the law of the state where the court sits, with "federal law" entering the picture only for the purpose of deciding whether a state's assertion of jurisdiction contravenes a constitutional guarantee.[4] In all proba-

4. A district judge in the Sixth Circuit seems to have construed Scholnik v. National Airlines, 219 F.2d 115 (6 Cir. 1955) as establishing a "federal standard" although disagreeing with the view he thought it announced, Shuler v. Wood,

bility the elaborate attempt, made in the appendix to the dissenting opinion, to whittle this comprehensive body of authority down to the Third and Seventh Circuits is sufficiently answered by the language we have quoted from various opinions. However, it may not be amiss to add that the premise of the argument, namely, that all cases arising under F.R. Civ.Proc. 4(d) (7) must be disregarded, is quite unsound. F.R.Civ.Proc. 4(d) (3) and (7) both relate to the manner of service and leave open the question whether the foreign corporation was subject to service in any manner. Thus, although the Pulson case, for example, arose under Rule 4(d) (7), the issue was not as to the person served but as to the liability of the defendant to service. It was that issue which Judge Goodrich, writing for the First Circuit, held to be one of state law, subject only to federal constitutional limitations. Judge Goodrich cited and relied on Pulson and expressly disagreed with the contrary view, stated in an earlier edition of Professor Moore's treatise and advanced in the instant dissent, when he wrote for Judge

Hastie and himself in Partin, supra, 202 F.2d at 542–543, in his own circuit, a case which our brother Clark recognizes to be directly in point against the position advocated by him.

The only contrary voice by a court of appeals is our decision, by a divided panel, in Jaftex Corporation v. Randolph Mills, Inc., 282 F.2d 508 (2 Cir. 1960). In that case all three judges agreed that a judgment in the Southern District of New York dismissing a complaint against a North Carolina corporation should be reversed because New York would have asserted jurisdiction under a constitutionally valid statute. But a majority went on to elaborate in an opinion by Judge Clark, as an alternative ground for coming to the same conclusion, "that the question whether a foreign corporation is *present* in a district to permit of service of process upon it is one of federal law governing the procedure of the United States courts and is to be determined accordingly." 282 F.2d at 516. The service there was evidently thought to be good under this "federal standard", although the opin-

198 F.Supp. 801 (E.D.Tenn.1961), and a "federal standard" was approved by another district judge in First Flight Co. v. National Carloading Corp., 209 F.Supp. 730 (E.D.Tenn.1962). However, the issue was not determined in Scholnik. Although the Scholnik opinion discussed federal constitutional decisions rather than Ohio law, this must be read against the Sixth Circuit's earlier statement that the Ohio courts had declared that the state's "doing business" statute "should be liberally construed to facilitate the obtaining of jurisdiction over a foreign corporation doing business in Ohio, where a citizen of that state seeks redress upon a transaction with such foreign corporation," Bach v. Friden Calculating Mach. Co., 167 F.2d 679, 680 (6 Cir. 1948), and thus as going to the limits which the Federal Constitution permitted. The *per curiam* opinion in Lasky v. Norfolk & W. Ry. Co., 157 F.2d 674 (6 Cir. 1946), is similarly explicable. The Sixth Circuit later held, WSAZ, Inc. v. Lyons, 254 F.2d 242, 244 (6 Cir. 1958), that in a removed action against a foreign corporation, jurisdiction of the federal court depended on whether the state court had acquired it—obviously a matter of state statute

and decisional law subject to federal constitutional requirements. The writer of the WSAZ, Inc. opinion and a judge who joined in it had also participated in Scholnik; one would suppose that if the Sixth Circuit thought it had adopted a rule leading to different treatment of foreign corporations in original and removed suits, it would have made that clear to the profession. The issue was likewise not determined by the district judges in Shuler v. Wood, supra, where the court found the defendant was within valid Tennessee "doing business" statutes, or in the First Flight case, supra, where the court ended up by deciding on the basis that federal jurisdiction was founded on the presence of a federal question. Another district judge in the Sixth Circuit has properly not regarded Scholnik as a pronouncement for a "federal standard"; he held rather, citing Bach and other cases, as well as Judge Goodrich's opinions in Pulson and Partin, that "state law governs whether a foreign corporation is subject to service in a diversity action." Singleton v. Atlantic Coast Line R. R., 20 F.R.D. 15, 18 (E.D. Mich.1956).

ion does not say just what that standard is or where it can be found. *In banc* reconsideration of Jaftex was not sought. In the instant case a majority of the panel (Friendly and Marshall, JJ., Clark, J., dissenting), believing that the alternative ground of decision in Jaftex was unwarranted, was causing confusion by its failure to identify or define the "federal standard", and was leading to unfortunate results in the district courts,[5] and that we should bring ourselves in line with other circuits, requested that the case be considered *in banc* on the briefs already before us. This request for *in banc* consideration was granted, Judge Clark alone dissenting. We have concluded that the alternative ground of decision in Jaftex, asserting a "federal standard" for jurisdiction over foreign corporations in ordinary diversity cases, should be overruled.

No federal statute or Rule of Civil Procedure speaks to the issue either expressly or by fair implication. 28 U.S.C. § 1391(c), providing that "[a] corporation may be sued in any judicial district in which it is incorporated or licensed to do business or is "doing business,"

relates to venue and not to jurisdiction, as is made clear by considerations pointed out in the concurring opinion in Jaftex, 282 F.2d at 518, and there recognized by the majority, 282 F.2d at 512. Neither is any instruction to be found by combining the provision in F.R.Civ.Proc. 4(d) (3) that service may be made "upon a domestic or foreign corporation or upon a partnership or other unincorporated association which is subject to suit under a common name, by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process (and,) if the agent is one authorized by statute to receive service and the statute so requires, by also mailing a copy to the defendant," with the provision of Rule 4(d) (7) that in the case of "a defendant of any class referred to in paragraph (1) or (3) of this subdivision of this rule, it is also sufficient if the summons and complaint are served in the manner prescribed by any statute of the United States or in the manner prescribed by the law of the state in which the service is made for the service

---

5. A striking instance is Southern New England Distrib. Corp. v. Berkeley Finance Corp., 30 F.R.D. 43 (D.Conn. 1962). The district judge, on the basis of a scholarly review of Connecticut statute and decisional law, found (1) that "Connecticut, as a matter of state policy, has recognized the advantage of not imposing qualifications on the right of foreign corporations to conduct some kinds of commercial and financial transactions, since it has enumerated certain business activities of foreign corporations which do not constitute 'transacting business';" (2) that the defendant's activities came within these exclusions, as found in Conn. Gen.Stats. § 33–397(b); and (3) that the complaint did not allege tortious conduct in Connecticut under another statute, § 33–411(c) (4), authorizing service on a foreign corporation in such a case "whether or not such corporation is transacting business in this state." 30 F.R.D. at 45–48. Yet, in deference to Jaftex, these modern and comprehensive statutes, representing Connecticut's assessment of the relative interest of plaintiffs, defendants, and the state itself, were set at naught, in an ordinary diversity

suit, in favor of a supposed "federal standard."

In fact, the Southern New England result may not have followed so inevitably from Jaftex as the judge thought. For the case came into the federal court on removal, and thus Connecticut law would still govern the validity of the service (subject, of course, to constitutional limitations), unless Jaftex overruled *sub silentio* not only Judge L. Hand's decision in Bomze v. Nardis Sportswear, Inc., 165 F.2d 33, 35 (2 Cir. 1948), but also Lambert Run Coal Co. v. Baltimore & O. R.R., 258 U.S. 377–382, 42 S.Ct. 349, 66 L.Ed. 671 (1922)—no mean feat for two judges of a court of appeals. But this probable error serves to highlight another unhappy effect of Jaftex, discussed below, the undesirability of having two different rules for jurisdiction over foreign corporations in diversity actions depending on whether the case is originally brought in the federal court or is removed there. And the unfortunate result which the judge thought that Jaftex obliged him to reach would have been required in a suit brought originally in federal court.

of summons or other like process upon any such defendant in an action brought in the courts of general jurisdiction of that state." To do so would put far more strain on the words "or foreign" in Rule 4(d) (3) and "also" in Rule 4(d) (7) than they will bear. No one reading the Rule would be likely to get the impression that Rule 4(d) (3) was a charter to the federal courts to make their own law as to when a foreign corporation is subject to suit and that the effect of Rule 4(d) (7) is to make state standards of jurisdiction *alternatively* applicable. The Advisory Committee's Notes reveal no such intention; rather they emphasize the much more limited one, which the language of the Rule indicates, of regulating the *manner* of service, saying that paragraph (3) "enumerates the officers and agents of a corporation or of a partnership or other unincorporated association upon whom service of process may be made * * *." Eminent authority thus seems entirely justified in concluding that "Rule 4(d) (3) of the Rules of Civil Procedure tells (how) service of process is to be made upon a corporation which is subject to service; but, it does not tell when the corporation is so subject." Hart & Wechsler, The Federal Courts and the Federal System, 959 (1953).

Despite contrary intimations as to our position in the dissent, we fully concede that the constitutional doctrine announced in Erie R. R. v. Tompkins, 304 U.S. 64, 78–80, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), would not prevent Congress or its rule-making delegate from authorizing a district court to assume jurisdiction over a foreign corporation in an ordinary diversity case although the state court would not; and we reaffirm decisions of this Court that have sustained the application of certain Federal Rules of Civil Procedure differing from the

rules applied by the state where the court sits. Iovino v. Waterson, 274 F.2d 41 (2 Cir. 1960), cert. denied, 362 U.S. 949, 80 S.Ct. 860, 4 L.Ed.2d 867 (1961) [Rule 25(a) (1) relating to substitution]; Hope v. Hearst Consol. Publications, Inc., 294 F.2d 681 (2 Cir. 1961), cert. denied, 368 U.S. 956, 82 S.Ct. 399, 7 L.Ed.2d 388 (1962) [Rule 43(a) relating to evidence], the latter decision relying heavily on Monarch Ins. Co. v. Spach, 281 F.2d 401 (5 Cir. 1960), quoted in the instant dissent. But we find no federal policy that should lead federal courts in diversity cases to override valid state laws as to the subjection of foreign corporations to suit, in the absence of direction by federal statute or rule. State statutes determining what foreign corporations may be sued, for what, and by whom, are not mere whimsy; like most legislation they represent a balancing of various consid-erations—for example, affording a forum for wrongs connected with the state and conveniencing resident plaintiffs, while avoiding the discouragement of activity within the state by foreign corporations. We see nothing in the concept of diversity jurisdiction that should lead us to read into the governing statutes a Congressional mandate, unexpressed by Congress itself, to disregard the balance thus struck by the states.[6] The famed judicial statement of the reason for diversity jurisdiction, "However true the fact may be, that the tribunals of the states will administer justice as impartially as those of the nation, to parties of every description, it is not less true that the constitution itself either entertains apprehensions on this subject, or views with such indulgence the possible fears and apprehensions of suitors, that it has established national tribunals for the decision of controversies between aliens and a citizen, or between citizens of different states," Marshall, C. J., in Bank of the

6. The diversity clause of Article III was not one of the provisions of the Constitution about which the founders felt very deeply. Madison thought it was not "a matter of much importance. Perhaps it might be left to the state courts." 2 Elliot, Debates on the Federal Consti-

tution (1828), at 391. Marshall conceded in the Virginia convention, "Were I to contend, that this was necessary in all cases, and that the government without it would be defective, I should not use my own judgment." Id. at 406.

United States v. Deveaux, 5 Cranch. (9 U.S.) 61, 87, 3 L.Ed. 38 (1809), does not suggest that the founders were concerned with rendering diversity defendants, who might be either in-staters or out-of-staters, more readily suable in the federal court than they would be in the state court. Thus, the present dissent points out no federal policy that makes it important to provide this Maryland plaintiff with a federal forum in Vermont, if Vermont itself would not entertain such an action, for what in every practical sense is a suit against another out-of-stater on a claim arising predominantly, if not wholly, outside the state. If the suit was by an in-stater, the case for a "federal standard" broader than the state's would be still weaker; there is no federal concern for enabling such a plaintiff to sue a foreign corporation in his own state when that very state, though having the power to do so, has declined to make its own courts available. And in the classic case of diversity jurisdiction, the suit by an out-of-stater against a true in-stater (in the present context, a foreign corporation really identified with the state), such a "federal standard" would be quite superfluous, for the "state standard" will almost inevitably ensure jurisdiction. Supreme Court decisions enforcing state "door-closing" statutes in the federal courts, and the reasons there expressed, Angel v. Bullington, 330 U.S. 183, 191–192, 67 S.Ct. 657, 91 L.Ed. 832 (1947); [7] Woods v. Interstate Realty Co., 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524 (1949), [8] appear to point in precisely the opposite direction from the dissent here; it seems immaterial that in such cases the state policy is expressed as a closing of the door against a particular kind of suit or plaintiff rather than as a refusal to pull a particular kind of defendant through the door. State policy is involved in one case as much as in the other, and in the absence of an overriding federal interest intimated by Congress or its delegate, should be equally respected.

Our belief that neither the federal legislature nor the federal rule-makers have had any intention to displace state statutes as to the taking of jurisdiction over foreign corporations in ordinary diversity cases is strengthened by instances where, in certain types of federal question litigation, Congress has provided for service of process outside the district. A fairly early example is § 12 of the Clayton Act, 15 U.S.C. § 22, which directs that in any action under the anti-trust laws against a corporation, venue may be laid in any district "whereof it is an inhabitant" or "wherein it may be found or transacts business", and that process may be served "in the district of which it is an inhabitant, or wherever it may be found." This seems to show that Congress neither thought there existed nor wished to create a "federal standard" broad enough to warrant service of process in antitrust litigation in any district where a corporation "transacts business"; it directed that transaction of business was to suffice for venue but that process was then to be served elsewhere. See Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927) (venue in action against Eastman laid in Northern District of Georgia but process served at head office in Rochester, N. Y.); United States v. Scophony Corp., 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 1091 (1948). A similar scheme was used

---

7. "The essence of diversity jurisdiction is that a federal court enforces State law and State policy. If North Carolina has authoritatively announced that deficiency judgments cannot be secured within its borders, it contradicts the presuppositions of diversity jurisdiction for a federal court in that State to give such a deficiency judgment. North Carolina would hardly allow defeat of a State-wide policy through occasional suits in a federal court." 330 U.S. at 191–192, 67 S.Ct. at 661, 662.

8. A state statute barring suit by foreign corporations which had not qualified is applicable in a federal court: " * * * a right which local law creates but which it does not supply with a remedy is no right at all for purposes of enforcement in a federal court in a diversity case." 337 U.S. at 538, 69 S.Ct. at 1237.

in § 22 of the Securities Act of 1933, 15 U.S.C. § 77v, in § 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, in § 25 of the Public Utility Holding Company Act of 1935, 15 U.S.C. § 79y, and in § 44 of the Investment Company Act of 1940, 15 U.S.C. § 80a–43a—all of which, of course, apply to individuals as well as to corporations. See also the legislation as to national banks dealt with in Mercantile Nat. Bank v. Langdeau, 371 U.S. 555, 83 S.Ct. 520, 9 L.Ed. 2d 523 (1963), and Michigan National Bank v. Robertson, 372 U.S. 591, 83 S.Ct. 914, 9 L.Ed.2d 961 (1963).[9]

We are told, however, that the existence of a "federal standard" of jurisdiction over foreign corporations in diversity cases has been established by binding authority which the many courts of appeals and district courts that have decided otherwise have failed to perceive or understand.[10] Consideration of this contention requires analysis of the history of the taking of jurisdiction over foreign corporations.

As has often been pointed out, the courts have had difficulty in evolving a satisfying justification for this. At the start, they had to overcome the notion that a corporate entity could have no legal existence outside the state of its creation. See Bank of Augusta v. Earle, 13 Pet. (38 U.S.) 519, 588, 10 L.Ed. 274 (1839). For many years, beginning with LaFay-

ette Ins. Co. v. French, 18 How. (59 U.S.) 404, 408, 15 L.Ed. 451 (1856), the received theory, which can be found in Supreme Court decisions as late as Mr. Justice Stone's in Louisville & Nashville R. R. v. Chatters, 279 U.S. 320, 325–326, 49 S.Ct. 329, 73 L.Ed. 711 (1929), was of "implied consent" by the foreign corporation to state statutes conditioning the right to do business on amenability to suit. Most of the Supreme Court cases as to challenges to the assertion of jurisdiction over foreign corporations during this period came from state courts. There the state had authoritatively construed its statute and the Supreme Court decided only the issue of constitutionality. But even when the case came from a lower federal court, the question whether the corporation's "consent" embraced the particular suit was necessarily one of state law, for the "consent" was to what the state statute constitutionally demanded, and the construction of state statutes, even in the heyday of Swift v. Tyson, 16 Pet. (41 U.S.) 1, 10 L.Ed. 865 (1842), was for state judges, although the question whether the state might permissibly exact such a consent was a constitutional one. Hence we find it impossible to regard the four opinions by Mr. Justice Brandeis,[11] the future author of Erie, which are cited in Professor Moore's treatise, 2 Federal Practice (2d ed. 1962), at 969, although not for this precise point, as establishing a "federal-

---

9. We express no opinion whether a "federal standard" may govern jurisdiction over foreign corporations in federal question litigation not covered either by such special statutes or by contrary ones assimilating the situation to diversity litigation, e. g., § 23 of the Bankruptcy Act. Suffice it to say that the considerations favoring the overriding of state policy would be far more persuasive than in an ordinary diversity suit. We likewise express no opinion as to what standard is to govern when process is served outside the state under the 100-mile provision for certain types of litigation, added to F.R.Civ.Proc. 4(f) effective July 1, 1963.

10. As to the argument based on § 11 of the First Judiciary Act (now embodied in 28 U.S.C. § 1391), it is enough to say that this has always been a venue

provision and nothing more. The dissent is right in stating that we have given no weight to 28 U.S.C. § 1693, also stemming from § 11, which says, "Except as otherwise provided by Act of Congress, no person shall be arrested in one district for trial in another in any civil action in a district court." The allegedly important bearing of this provision still escapes us.

11. Philadelphia & Reading Ry. Co. v. McKibbin, 243 U.S. 264, 37 S.Ct. 280, 61 L. Ed. 710 (1917); Rosenberg Bros. & Co. v. Curtis Brown Co., 260 U.S. 516, 43 S.Ct. 170, 67 L.Ed. 372 (1923); Bank of America v. Whitney Central National Bank, 261 U.S. 171, 43 S.Ct. 311, 67 L. Ed. 594 (1923); James Dickinson Farm Mortgage Co. v. Harry, 273 U.S. 119, 47 S.Ct. 308, 71 L.Ed. 569 (1927).

standard" as to jurisdiction over foreign corporations.[12] The writer of the opinion in Barrow S.S. Co. v. Kane, 170 U.S. 100, 18 S.Ct. 526, 42 L.Ed. 964 (1898), on which Professor Moore does rely, id. at 970, appears to have been unconscious that he was giving birth to a "federal standard" of jurisdiction over foreign corporations; the thrust of the opinion was rather that the corporation was doing enough in New York to be suable there on any standard, and that the state's "door-closing" statute with respect to causes of action arising outside the state would not be honored in the federal courts—a view inconsistent with the later decisions in Angel v. Bullington, supra, and Woods v. Interstate Realty Co., supra.

The consent doctrine was later succeeded, or supplemented, by a theory of "presence"; judges developed wondrous capacity to determine that a foreign corporation was "present" in the state in certain instances, but "absent" from it in others although something had somehow gotten done there. These spooks were banished, and fresh air let in, by Judge Learned Hand's observation in Hutchinson v. Chase & Gilbert, Inc., 45 F.2d 139, 141 (2 Cir. 1930), that "It is difficult, to us it seems impossible, to impute the idea of locality to a corporation, except by virtue of those acts which realize its purposes. * * * If we are to attribute locality to it at all, it must be equally present wherever any part of its work goes on, as much in the little as in the great"; the basis for determining whether or not to take jurisdiction, he suggested, was to be found not in metaphysical subleties but in a standard of reasonableness. Since Hutchinson was a removed case,

Judge Hand could hardly have been thinking in terms of "federal law," see Bomze v. Nardis Sportswear, Inc., 165 F.2d 33, 35 (2 Cir. 1948), save for the limiting principles of the due process clause of the Fourteenth Amendment (and in some instances other constitutional provisions). Then came International Shoe Co. v. Washington, 326 U.S. 310, 317, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945), a case from a state court, in which the Supreme Court recognized that concepts such as consent and presence are mere rationalizations and that, in the words of Chief Justice Stone, the true question is the existence "by such contacts of the corporation with the state of the forum as make it reasonable, in the context of our federal system of government, to require the corporation to defend the particular suit which is brought there."

The decision of what contacts, within the constitutionally permitted sphere, shall suffice to make a foreign corporation subject to suit is, one for the state to make in the first instance; once the state has made this, there is no reason for a federal court to go further—or less far—when it is acting under a head of jurisdiction supposedly designed to protect certain suitors from possible prejudice by state courts. We do not deny that the diversity clause of the Constitution also has a potential utility in permitting a federal court, with the possibility of nation-wide service of process, to give a remedy unavailable elsewhere. But to do that in limited classes of cases, under statutes specially designed for the purpose, e. g., interpleader, 28 U.S.C. § 2361, or proposals currently under discussion by the American Law Institute,[13] is

---

12. An additional reason is that the Rosenberg Bros. and James Dickinson cases came into the federal court by removal, where a federal court has only such jurisdiction as the state court had. Mr. Justice Brandeis had written only a year before Rosenberg Bros.: "If the state court lacks jurisdiction of the subject-matter or of the parties, the federal court acquires none * * *." Lambert Run Coal Co. v. Baltimore & O. R. R., 258 U.S. 377, 382, 42 S.Ct. 349, 351, 66 L.Ed. 671 (1922). Yet nothing in the four opinions suggests that the Court had a different "standard" in mind for the two original-jurisdiction cases.

13. See American Law Institute, Study of the Division of Jurisdiction between State and Federal Courts, Tentative Draft No. 1, pp. 21–32, 70–108. In view of the dissent's emphasis on academic support for Jaftex, based on a few law review comments, it is of interest that the proposal

quite a different matter from permitting every plaintiff entitled to invoke diversity jurisdiction to escape state policy with respect to the amenability to suit of foreign corporations, always suable in the state of their domicile, by bringing his action in a federal rather than a state court.

We see little relevancy in the citation of Byrd v. Blue Ridge Rural Elec. Co-op., 356 U.S. 525, 537–540, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958), and Simler v. Conner, 372 U.S. 221, 83 S.Ct. 609, 9 L.Ed.2d 691 (1963), holding that whether an issue is of the sort triable to a jury must be decided as a matter of federal law regardless of the law of the state where the court sits, and surely no warrant for saying that the latter decision has reinforced the alternative ground of Jaftex. These cases proceed on the basis that "the federal policy favoring jury decisions of disputed fact questions", a policy framed "under the influence—if not the command—of the Seventh Amendment", 356 U.S. at 537–538, 78 S.Ct. at 900, 901, and "of historic and continuing strength," 372 U.S. at 222, 83 S.Ct. at 610 was such that federal courts should not yield to a contrary "state rule in the interest of furthering the objective that the litigation should not come out one way in the federal court and another way in the state court," 356 U.S. at 538, 78 S.Ct. at 901. We are aware of no federal policy of similar strength or constitutional basis that would justify disregard of state laws as to when a foreign corporation may be held to answer in a suit like the present. How warily the Supreme Court proceeds in disregarding state law even in the area of jury trial is shown by its refusal to decide whether federal courts in diversity actions may develop

their own standards as to the quantum of evidence necessary for submission to a jury. Dick v. New York Life Ins. Co., 359 U.S. 437, 444–445, 79 S.Ct. 921, 3 L.Ed.2d 935 (1959); and see the recent denial of certiorari, two Justices dissenting, 371 U.S. 935, 83 S.Ct. 307, 9 L.Ed.2d 271 (1962), to review Merritt-Chapman & Scott Corp. v. Gunderson Bros. Eng. Corp., 305 F.2d 659 (9 Cir.).[14]

Neither do we find force in the statement in Jaftex, 282 F.2d at 513, that "[t]he federal and state rules are certainly not so mutually at odds that the federal decision will seriously damage state polity." When, as in the New York situation there *sub judice*, the state standard and the supposed "federal standard" are identical or nearly so, it is hard to see what useful purpose the concept of a separate "federal standard" serves; when the "federal standard" is alleged to be significantly different from that which the state has chosen, it is equally hard to see what justification there is for it. One may agree with the premise of the dissent that the quest for uniformity between state and federal courts can be pushed too far, particularly when the issue may reasonably be denoted as one of procedure, without accepting the apparent conclusion that deliberately creating a difference in result between state and federal courts on an issue such as jurisdiction over foreign corporations in a diversity case is so demonstrable a good as to warrant federal judges in substituting their views for state legislators'. This is especially true when the inevitable result is to create still another difference—between diversity cases coming to the federal courts initially and those coming on removal, where we do not understand how it can

by the Council of the American Law Institute is that Congress enact a contrary rule for ordinary diversity cases. Id. § 1303, pp. 11, 54–56. The Institute's Reporters are Professor Richard H. Field of Harvard and Professor Paul T. Mishkin of Pennsylvania; their advisers include Professor Henry M. Hart, Jr., of Harvard and Professor Herbert Wechsler of Columbia, now Director of the Insti-

tute. At the meeting of the Institute in May, 1963, the Reporters agreed to consider whether the proposed provision should not take the form of a Rule rather than a statute.

14. The dissent's disapproval of some of our decisions relating to this subject thus seems at least premature.

be asserted that the federal court has jurisdiction over a foreign corporation if the state court did not.[15] Viewed in the light of International Shoe and the subsequent cases, assertion of a state's judicial jurisdiction over foreign corporations was simply an earlier instance of the same principle that underlies the assertion of such jurisdiction over non-resident individuals having, or having had, sufficient "contacts" with the state. See Chief Justice Stone's reference to Hess v. Pawloski, 274 U.S. 352, 47 S.Ct. 632, 71 L.Ed. 1091 (1927), in International Shoe, 326 U.S. at 316, 318, 66 S.Ct. at 158, 159.[16] Absent a direction in statute or rule, there is no more reason, in an ordinary diversity case, for a federal court to make up its own law in the former situation than in the latter.[17]

## II.

Having concluded that jurisdiction over the person of the defendant is to be determined here on the basis of constitutionally valid Vermont law, we reach the question whether we should make the

determination on our own account or remand for initial consideration by the district judge.

Vermont's provisions with respect to personal jurisdiction over foreign corporations are contained in Subchapter 6 of Title 12 of the Vermont Statutes. Section 851 provides that "[w]hen a foreign corporation has appointed the secretary of state as its process agent, pursuant to the statutes relating to such corporations, service of process, made upon such secretary by delivering to him duplicate copies thereof, shall be sufficient." Whether Vermont would think UPI had been "doing business" in the state to an extent requiring it so to appoint the secretary of state, 11 V.S.A. §§ 652(a), 691(a), 692(3), is not clear. See Kinnear & Gager Mfg. Co. v. Miner, 89 Vt. 572, 96 A. 333 (1916); cf. Star-Chronicle Pub. Co. v. United Press Ass'ns, 204 F. 217 (8 Cir. 1913). In any event, UPI had not so appointed him, and Vermont, unlike many states, see, e. g., Conn.Gen.Stats. § 33–411(b), has no statute providing generally that a for-

15. The dissent seems to concede this but does not explain why Congress should have wished the bizarre results that the concession entails. Thus, under the "federal standard" view, a foreign corporation which could have a suit by an in-stater dismissed in the state court or on removal if the "state standard" was narrower than the federal one, would gain nothing thereby since it would be subject to suit by the in-stater in the federal court.

16. See also the reference to Hess v. Pawloski and to Henry L. Doherty & Co. v. Goodman, 294 U.S. 623, 55 S.Ct. 553, 79 L.Ed. 1097 (1935), in McGee v. International Life Ins. Co., 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), and the statement in American Law Institute, Restatement of Judgments, § 28, comment a.

17. We have taken the references in Jaftex, see 282 F.2d at 510, to leading Supreme Court opinions on constitutionality to mean that the "federal standard" was coterminous with the outermost limit permitted to a state under the due process clause of the Fourteenth Amendment. It would seem curious that a "federal standard" should be framed in terms of an

Amendment applicable to state rather than federal action, and the dissent repudiates this view. We are told that the "federal standard" is quite well known and reasonably precise, but are given little further information about it save for phrases like "doing business" and "presence," which have meant many different things to different courts and, as Judge Learned Hand held in Hutchinson v. Case & Gilbert, supra, boil down to notions of what is fair and reasonable, with much depending on the nature of the plaintiff's claim. It is far from apparent why principles of fairness and reasonableness concerning the *locus* of suit should be thought to subject this defendant, which was available for service at its home office in New York and presumably in many other places where it had substantial establishments, but was doing very little in Vermont, to process in Vermont in a suit by a nonresident on a claim which, so far as now appears, is wholly unrelated to anything done in that state. Paraphrasing Judge Hand, 45 F.2d at 142, it would seem fairer that Arrowsmith should have come to New York, or have stayed in Baltimore, than that UPI should go to Vermont.

eign corporation which does business in the state without obtaining a required certificate of authority and appointing an agent to receive process shall be subject to suit as if it had done what it ought to have done. Vermont does have two statutes that assert jurisdiction over unregistered foreign corporations in certain circumstances, but neither seems applicable here. One, which authorizes service on "an agent, messenger or operator of such company"—broadened in 1959, Public Act No. 261, § 11, to include other persons on whom process against a domestic corporation could be served—is limited to "a foreign insurance, express, shipping car, telephone or telegraph company or other foreign company doing like business" in the state, 12 V.S.A. §§ 853, 854, all of these being companies which serve the public generally and are subject to state regulation, as UPI does not and is not, even if we should assume Vermont would think it was "doing business" in the state at all.[18] The other statute, 12 V.S.A. § 855, provides that:

> "If a foreign corporation makes a contract with a resident of Vermont to be performed in whole or in part by either party in Vermont, or if such foreign corporation commits a tort in whole or in part in Vermont against a resident of Vermont, such acts shall be deemed to be doing business in Vermont by such foreign corporation and shall be deemed equivalent to the appointment by such foreign corporation of the secretary of the state of Vermont and his successors to be its true and lawful attorney upon whom may be served all lawful process in any actions or proceedings against such foreign corporation arising from or growing out of such contract or tort."

Since plaintiff is not a resident of Vermont as § 855 requires,[19] it is unneces-

18. 12 V.S.A. § 853, imposing a penalty on the specified types of companies doing business in Vermont for failing to designate the secretary of state as process agent as required, and 12 V.S.A. § 854, providing that when a stipulation so appointing the secretary is not filed, "process may be served by delivering a true and attested copy thereof, with the officers' return thereon to an agent, messenger or operator of such company residing in this state or to any person enumerated in section 813 of this title," have been coupled ever since the Vermont legislature adopted "An Act Providing for Service of Process on Foreign Insurance, Express, Telegraph and Telephone Companies," Laws of 1884, No. 46, in which these provisions were §§ 3 and 4, and codifiers of Vermont law have uniformly linked the two sections thereafter. See V.S.1894, §§ 4168–69; V.P.L.1906, §§ 4747–48; V.G.L.1917, §§ 1741–42; V.P.L. 1933, §§ 1524–25; V.S.1947, §§ 1560–61; 12 V.S.A.1958, §§ 853–54. The 1959 amendment of § 854, Public Act No. 261, § 11, broadened the category of persons upon whom the summons could be served to include the same persons as a current revision of § 813 provided in the case of domestic corporations; but nothing in the text suggests an intention to expand § 854 to include all foreign corporations rather than the limited category to which

it had been restricted since its original enactment in 1884.

19. Question might be raised whether Vermont's limiting the benefits of this corporate "long-arm" statute to plaintiffs who are Vermont residents is consistent with the equal protection clause of the Fourteenth Amendment and the privileges and immunities clause, Art. IV, § 2. A sufficient answer may lie in McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), where the California statute in issue was confined to suits on insurance contracts with California residents and was sustained in part on that very ground; moreover, the Court cited with approval, 355 U.S. at 223, 78 S.Ct. at 201 n. 2, Smyth v. Twin State Improvement Co., 116 Vt. 569, 80 A.2d 664, 25 A.L.R.2d 1193 (1951), sustaining the constitutionality of 12 V.S.A. § 855. If the validity under the due process clause of the Fourteenth Amendment of subjecting a foreign corporation to suit within a state on the basis of isolated activities within it depends upon a balancing of the interests of the plaintiff and the defendant, see 73 Harv.L.Rev. 909, 923–28 (1960), the fact that the plaintiff resides within the state is surely a relevant consideration, as the McGee decision indicates. The state has an interest in not making it too burden-

sary to determine whether Vermont would consider that the mere transmission from outside the state to defendant's Vermont subscribers of a dispatch alleged to libel a person not claimed to have any reputation in Vermont, or to have been injured in his reputation elsewhere by the transmission to Vermont, constituted the commission of a tort "in whole or in part in Vermont." Cf. Tingley v. Times-Mirror Co., 144 Cal. 205, 206, 77 P. 918, 919 (1904).

Although the case thus does not appear to come within either of these statutes, the questions remain whether Vermont would nevertheless fill the gap between them and assert jurisdiction over this defendant on the basis, stated a half century ago in the attachment case of Somerville Lumber Co. v. Mackres, 86 Vt. 466, 85 A. 977–978 (1913), that "there being no statute specifically relating to the service of process on foreign corporations doing business in this state other than the one requiring them to appoint a process agent, they must be taken, if they omit that, to assent to be served with process the same as other non-resident defendants are served", and whether the Fourteenth Amendment would permit Vermont to do that on the facts here. See Hanson v. Denckla, 357 U.S. 235, 251, 78 S.Ct. 1228, 2 L.Ed.2d

1283 (1958); Blount v. Peerless Chemicals, Inc., 316 F.2d 695 (2 Cir. 1963). While it would be valuable to have the benefit of Judge Gibson's consideration of the first question, and, indeed, of the other matters of Vermont law that we have mentioned, there would be no point in imposing a further burden upon him and upon the parties if assertion of jurisdiction by Vermont over the person of UPI in this action would violate the Fourteenth Amendment. On the rather meagre record before us, this might well be so. UPI's Vermont activities, while perhaps greater than those of the defendants in Blount v. Peerless Chemicals, Inc., supra, or in New York Times Co. v. Sullivan, 273 Ala. 656, 144 So.2d 25 (1962), cert. granted, 371 U.S. 946, 83 S.Ct. 510, 9 L.Ed.2d 496 (1963), were rather small and did not arise from a privilege that Vermont could have withheld. Hanson v. Denckla, supra, 357 U.S. at 252, 78 S.Ct. at 1239. The Supreme Court's most advanced decisions in this area have stressed that the obligation in suit arose out of the corporation's activity in the state, International Shoe Co. v. Washington, supra, 326 U.S. at 319, 66 S.Ct. at 159; McGee v. International Life Ins. Co., 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957);[20] that it was owing either to the state

some for foreign corporations to engage in activity within its borders. Even as regards contracts made or torts committed in the state, it would seem not unreasonable for it to limit a long-arm statute against foreign corporations to suits by its own residents, whose rights and welfare it desires to protect by affording them a readily accessible forum, without having to do this also for non-residents, who may be able to sue with equal convenience in another state and who can always obtain jurisdiction in the state of incorporation. If a statutory classification is thus appropriate in the administration of the due process clause, it can hardly be outlawed by the equal protection clause of the same Amendment. Invocation of the privileges and immunities clause against 12 V.S.A. § 855 would encounter the further obstacle that the statute speaks in terms of residents rather than citizens. See Douglas v. New York, N. H. & H. R. R., 279 U.S. 377,

49 S.Ct. 355, 73 L.Ed. 747 (1929). But see Toomer v. Witsell, 334 U.S. 385, 396–397, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948); Currie and Schreter, Unconstitutional Discrimination in the Conflict of Laws: Privileges and Immunities, 69 Yale L.J. 1323, 1347–49 (1960).

As to what the consequences would be if the limitation to residents were deemed invalid, see Mr. Justice Holmes concurring in Chambers v. Baltimore & O. R. R., 207 U.S. 142, 151, 28 S.Ct. 34, 53 L. Ed. 143 (1907); Currie and Schreter, Unconstitutional Discrimination in the Conflict of Laws: Equal Protection, 28 U.Chi.L.Rev. 1, 14 n. 70 (1960).

20. In Perkins v. Benguet Consolidated Mining Co., 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952), where the obligation did not so arise, the quantum of corporate activity was exceptionally large, the state having become the corporation's wartime headquarters.

itself as in International Shoe, see also Travelers Health Ass'n v. Virginia, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154 (1950), or to a resident as in McGee; and that the McGee case related to "an activity [insurance] that the State treats as exceptional and subjects to special regulation." Hanson v. Denckla, supra, 357 U.S. at 252, 78 S.Ct. at 1239. Here the plaintiff has not averred, either in the complaint or in his affidavit in opposition to the motion to dismiss, that he had any reputation in Vermont or was known to a single person there, or that his reputation anywhere else was injured by such "publication" as occurred in Vermont. The alleged injury was thus, so far as appears, suffered wholly outside Vermont and was not a result of anything done there. Mattox v. News Syndicate Co., 176 F.2d 897, 900 (2 Cir.) (L. Hand, J.), cert. denied, 338 U.S. 858, 70 S.Ct. 100, 94 L.Ed. 525 (1949); compare Christopher v. American News Co., 171 F.2d 275, 280-281 (7 Cir. 1948); see Tingley v. Times-Mirror Co., 144 Cal. 205, 206, 77 P. 918, 919 (1904); Caldwell v. Crowell-Collier Pub. Co., 161 F.2d 333, 335 (5 Cir.), cert. denied, 332 U.S. 766, 68 S.Ct. 74, 92 L.Ed. 351 (1947).[21] And the only "publication" alleged to have occurred in Vermont, the receipt of the dispatch by UPI's subscribers, not only is not alleged to have caused injury there or elsewhere but did not arise out of the activity in the state which is asserted to make defendant subject to suit, namely, the collecting and transmission of Vermont news by Isabelle McCaig.

On the other hand, the papers before us are meagre; a hearing, along with an amendment of the complaint which the judge might allow, may present a picture different from what we now have. We therefore remand for consideration of the issues relating to jurisdiction, and, if the District Court should find these favorably to plaintiff, the issue of venue, before any further consideration of the

merits. Since the court may not reach the venue issue, we shall not discuss it except to say that the court should not regard us as necessarily committed to the view, generally followed in the Southern District of New York but never passed on by us, whereby "the criteria which are applied in determining corporate presence for the jurisdictional purpose of effecting valid service of process" are "equally applicable to the venue provisions of § 1391(c)." Champion Spark Plug Co. v. Karchmar, 180 F.Supp. 727, 731 (S.D.N.Y.1960). Accord, Satterfield v. Lehigh Valley R.R., 128 F.Supp. 669 (S.D.N.Y.1955); Ostow & Jacobs, Inc. v. Morgan-Jones, Inc., 178 F.Supp. 150, 154 (S.D.N.Y.1959); First Congregational Church v. Evangelical & Reformed Church, 160 F.Supp. 651, 662-663 (S.D. N.Y.1958). But see Polizzi v. Cowles Magazines, Inc., 345 U.S. 663, 73 S.Ct. 900, 97 L.Ed. 1331 (1953); Remington Rand, Inc. v. Knapp-Monarch Co., 139 F.Supp. 613, 617-619 (E.D.Pa.1956); Rensing v. Turner Aviation Corp., 166 F.Supp. 790, 798 (N.D.Ill.1958); Carter v. American Bus Lines, Inc., 169 F.Supp. 460, 469-470 (D.Neb.1959).

The judgment dismissing the complaint is vacated and the cause remanded for further proceedings consistent with this opinion.

CLARK, Circuit Judge (dissenting).

In Jaftex Corp. v. Randolph Mills, 2 Cir., 282 F.2d 508, the two opinions considered at some length and with care a question of great national importance which can be ultimately settled only by the Supreme Court, namely, the law governing the obtaining of jurisdiction *in personam* of civil litigants in the federal courts. As will be developed below, the decision had a very good press in the law schools and among scholars. Now I am at a loss to understand the strong compulsion to eradicate root and branch the view there espoused that federal law con-

---

**21.** In this respect Arrowsmith's case is weaker than the plaintiff's in New York Times Co. v. Sullivan, supra, where Sullivan, a resident and public official of Ala-

bama, alleged that the libel had been circulated in that state and had injured his reputation there.

trolled, and to do so in what would seem a rather poor vehicle to achieve that result. After all the attempts at overkill, in the majority opinion, the question remains not to be laughed off or otherwise discounted, but is one going to the very heart of our national system of courts.

But even though this decision as a precedent has great potentialities of harm, the issue is not one which normally (and here) has any considerable practical effect so far as the litigants are concerned; the use in federal service under F.R. 4(d) (7) of the new "long-arm" statutes becoming popular in the states, as well as the parallel, rather than conflicting, development of state and federal principles in this area, as in Jaftex with reference to New York, ordinarily give little occasion for meaningful federal-state conflict. So here, in order to make a case for their reversal, the majority has to ascribe a really fantastic "door closing" meaning, arrived at by way of negative implication, to Vermont's affirmative grant to its residents of a "long-arm" remedy by service in particular instances on the secretary of state. The most natural conclusion here, just as in Jaftex, is that state and federal law as to service would yield the same result. Hence this seems to me a substantially manufactured case to register disagreement with Jaftex before the issue can get to the Supreme Court. This inconsiderable result is forced in a case where the district court did not advert to the issue and the plaintiff, a layman, greatly outmatched, filed his brief pro se without any mention of the matter. When I saw the turn the appeal was taking, I urged my brothers to appoint some lawyer of standing to represent the national interest and to assist us to a correct decision; but they have preferred to leave this most important interest unrepresented.

In their eagerness to blot out Jaftex, my brothers, it seems to me, have made an erroneous analysis of both the historical background and the present case law. I plan to cover both these aspects below; but since I consider yet more important the underlying philosophy and policy of the law and feel that this is sadly neglected by my brothers, I shall turn to it at once.

Now I think it clear that it is the assumed compulsion of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, and only that, which leads to my brothers' conclusion here; only such a positive mandate would justify rejecting the flexible and workable uniform standard so long followed in the federal courts for the vague, uncertain, conflicting rules of the states. And surely this is the more apparent when adoption of the supposed state rules carries with it an implied invitation for discrimination against federal citizens otherwise eligible to sue federalwise. But actually there is no such compulsion from Erie; the bite there was to see that a litigant's substantive rights are to be determined by the appropriate state law and are not to be prejudiced by the fact that they are being enforced in a federal court. Here state law as to libel will ultimately determine the plaintiff's rights on the merits, as the considerable and premature discussion of the merits by my brothers demonstrates. But this does not say how the federal courts shall be organized and how one is brought before them; indeed to put this in the hands of the states would be to destroy all reason for having a federal tribunal (in which the litigant has more confidence) enforce a litigant's rights accorded by state law. See Friendly, The Historic Basis of Diversity Jurisdiction, 41 Harv. L.Rev. 483 (1928). This would seem settled by recent decisions of the Supreme Court upholding the obligation of affording a trial according to federal standards. As the Court properly says: "The federal system is an independent system for administering justice to litigants who properly invoke its jurisdiction." Byrd v. Blue Ridge Rural Elec. Co-op., 356 U.S. 525, 537, 78 S.Ct. 893, 900, 2 L.Ed. 2d 953. The Court there declined to follow state law as to issues to be kept from the jury. This principle was definitively and finally set for diversity as well as other actions in Simler v. Conner,

372 U.S. 221, 83 S.Ct. 609, 9 L.Ed.2d 691, decided since, but re-enforcing, the Jaftex holding.

Contrary to the views of distinguished courts and commentators, the majority here brush these cases aside as only applications of the Seventh Amendment. But the matter cannot be so summarily dismissed. There is nothing in the Seventh Amendment to instruct as to this issue; and the result is one reached by the Court through a careful analysis of what a trial in the federal court essentially means. It is by no means so clearly compelled as is the result I am supporting here, which has a direct statutory base, as pointed out below. Moreover, reliance on the Seventh Amendment is a late afterthought with our court; in common with other, but not all, circuits we had brashly and overeagerly ruled at least three times that state law governed jury submissions in diversity cases. Gutierrez v. Public Service Interstate Transp. Co., 2 Cir., 168 F.2d 678, 680; Rowe v. Pennsylvania Greyhound Lines, 2 Cir., 231 F.2d 922, 924, cert. denied Pennsylvania Greyhound Lines v. Rowe, 351 U.S. 984, 76 S.Ct. 1052, 100 L.Ed. 1498; Presser Royalty Co. v. Chase Manhattan Bank, 2 Cir., 272 F.2d 838, 840; cf. O'Connor v. Pennsylvania R. Co., 2 Cir., 308 F.2d 911.[1] That experience of error should have warned us against overhasty application of the Erie principle to federal court organization in advance of Supreme Court direction.[2]

The correct rule is, I believe, ably stated by Judge Brown for a unanimous court in Monarch Ins. Co. of Ohio v. Spach, 5 Cir., 281 F.2d 401, refusing to apply to a federal diversity case a Florida statute excluding from evidence a written statement from a property owner concerning injury to his property where he had not been furnished a copy. Judge Brown speaks of the importance of the constitutional provision for diversity jurisdiction (which of course contains no limitation dependent on state action). He says, 281 F.2d 401, at page 407:

"Not the least of these countervailing considerations [against state practice] is the indispensable necessity that a tribunal, if it is to be an independent court administering law, must have the capacity to regulate the manner by which cases are to be tried and facts are to be presented in the search for the truth of the cause. As Erie epitomized, the constitutional factors subject federal courts in diversity cases to special limitations. But the jurisdiction of courts in such cases is no less constitutional than in non-diversity litigation. The judicial power of the United States vested by Art. III of the Constitution 'in such inferior Courts as the Congress may * * * establish' is declared to 'extend to all Cases, in Law and Equity * *; to Controversies * * *—between Citizens of different States * *.' A United States District Court clothed with power by Congress pursuant to the Constitution is not a mere adjunct to a state's judicial machinery. In entertaining diversity cases it is responding to a constitutional demand made effective by congressional action and, as the recent abstention cases have made so clear, it has a constitutional duty to hear and adjudicate."

It is significant that the Monarch Ins. Co. case and Jaftex are relied on by two acute commentators to justify their argument that federal rule-making authority may extend to uniform federal rules of evidence, now under consideration by the Judicial Conference of the United States and its committees. Degnan, The Law

---

1. For the conflicting cases collected see 2B Barron & Holtzoff, Federal Practice and Procedure § 871.1, pp. 10–19 (1961); 5 Moore's Federal Practice 92–104 (2d Ed. 1951), with cases cited at 102, n. 5, 1962 Cum.Supp. 8, 9.

2. Perrin v. Pearlstein, 2 Cir., 314 F.2d 863, seems another instance of undue haste to apply the Erie principle to reverse a jury verdict. See 2 Corbin on Contracts § 446 (1950) and 1962 Pocket Parts.

of Federal Evidence Reform, 76 Harv.L. Rev. 275 (1962); Ladd, Uniform Evidence Rules in the Federal Courts, 49 Va.L.Rev. 692 (1963). These cases also are relied on to support even more general conclusions of an increasing trend toward support of federal court control of its own organization and procedure, as in Vestal, Erie R.R. v. Tompkins: A Projection, 48 Iowa L.Rev. 248, 265–266 (1963), or in Green, Federal Jurisdiction in Personam of Corporations and Due Process, 14 Vand.L.Rev. 967, 979 (1961). See also Boner, Erie v. Tompkins: A Study in Judicial Precedent, 40 Texas L. Rev. 509, 619, 638–642 (1962); Carrington, The Modern Utility of Quasi in Rem Jurisdiction, 76 Harv.L.Rev. 303, 318–321 (1962); Smith, Blue Ridge and Beyond: A Byrd's-Eye View of Federalism in Diversity Litigation, 36 Tul.L.Rev. 443 (1962), as well as the law review notes

approving Jaftex, viz., Note, 47 Cornell L.Q. 286 (1962); Note, 74 Harv.L.Rev. 1662 (1961); Note, 22 Ohio St.L.J. 421 (1961); Note, 34 Temp.L.Q. 339 (1961); but see Note, 6 Vill.L.Rev. 404 (1961).[3] It seems not out of place to regard the general judgment of these scholars as more likely to state the law of the future than does my brothers' backward-looking opinion.

The question raised in the articles cited above as to the power to adopt federal uniform rules of evidence points to a whole series of problems resulting from the decision herein which are not considered by my brothers. If their conclusion is a necessary one it is hard to see how state rules of evidence must not control, as well as state rules of discovery, pre-trial, and the like. And if there is a dividing line to save some of the vaunted and attractive modern federal proce-

**3.** This scholarly response of a dozen articles, including a number by some of the most acute procedural scholars of the country, so soon after the decision and so unusual in both quality and quantity, hardly merits the majority's belittling denigration in its reference in note 13 to "academic support for Jaftex, based on a few [sic!] law review comments."

Of the general law text writers, Professor Moore criticizes as "not sound" the view of "[s]ome federal courts * * * that obtaining jurisdiction over a defendant is a matter falling under the Erie doctrine," 1A Moore's Federal Practice ¶ 0.317 [5], p. 3536 (2d Ed. 1961); 2 id. ¶ 4.25, pp. 970, 971 (2d Ed. 1962); while the opposite view is supported in 1 Barron & Holtzoff, Federal Practice and Procedure § 138, n. 35.4, § 179, n. 95.3 (Wright Ed. 1960), 1962 Pocket Parts § 138, nn. 35.4, 85, § 179, n. 95.3, but admitting a conflict in the cases. It is too early for extensive case citation of Jaftex; it is warmly approved in First Flight Co. v. National Carloading Corp., D.C.E.D.Tenn., 209 F.Supp. 730, and reluctantly followed (though actually doubtfully in point, see note 6 infra) in Southern New England Distributing Corp. v. Berkeley Finance Corp., D.C.Conn., 30 F.R.D. 43. See also the Appendix, p. 242, infra.

My brothers assume to find a modicum of that academic support, which they seem to need so desperately, in the ALI Study of the Division of Jurisdiction be-

tween State and Federal Courts (Tent. Draft No. 1, 1963), prepared by distinguished Reporters assisted by most distinguished Advisers, among whom the opinion writer here modestly omits reference to himself. It is difficult to perceive how much help can be drawn from this quite tentative and highly controversial, possibly courageous, possibly foolhardy, argument for preserving a shell of diversity jurisdiction, but only in sharply restricted form. Nowhere is there mention or direct discussion of Jaftex. But among the several proposals for limiting diversity jurisdiction, including the drastic one of denying it to a person in any district in a state of which he is a citizen, id. § 1302(a), p. 9, is one for a statute which rather ambiguously denies "binding effect" upon any party beyond that which the local state law "prescribes" in a like action brought in its courts of general jurisdiction, id. § 1303, p. 11, and see pp. 54–56. (Query: Is this intended to do anything more than restate the original Erie doctrine, without the later procedural glosses added by cases such as this?) One suspects, in these days of increasing racial tension, that Congress will long hesitate before sharply limiting access to the federal courts as thus urged. Incidentally, as pointed out in id. p. 56, n. 15, the enactment of these statutes will call for a "re-examination"—i. e., repeal—of the just adopted amendments to F.R. 4(e) and (f) discussed below.

dure, where is it and how is it to be defined? The opinion puts in jeopardy some of the most advanced principles of procedure we have, for, practically, under the majority's rule, the more technical and restrictive procedure will always control. Only yesterday we ruled that under federal rule the *ad damnum* clause of a complaint did not restrict a jury's verdict, even though the state rule be otherwise. Riggs, Ferris & Geer v. Lillibridge, 2 Cir., 316 F.2d 60, Apr. 10, 1963. How is this case now to be sustained under my brothers' view that state procedure, however outmoded, is the rule for the federal courts, at least in diversity cases? Like questions arise as to other of our decisions, including Iovino v. Waterson, 2 Cir., 274 F.2d 41, cert. denied Carlin v. Iovino, 362 U.S. 949, 80 S.Ct. 860, 4 L.Ed.2d 867, upholding the substitution of a foreign administrator under F.R. 25(a) (1), contrary to New York law—approved in Notes in 60 Colum.L.Rev. 738 (1960) and 73 Harv.L.Rev. 1618 (1960)—and Hope v. Hearst Consol. Publications, Inc., 2 Cir., 294 F.2d 681, cert. denied Hearst Consol. Publications, Inc. v. Hope, 368 U.S. 956, 82 S.Ct. 399, 7 L.Ed.2d 388, approved in Comment, 62 Colum.L.Rev. 1049, 1061–1076 (1962).

The majority opinion affects to find doubt as to the existing or pre-Erie rule and to make various assumptions about it, such as that it assumes to accept federal jurisdiction up to the limits permitted the states by the Fourteenth Amendment (an odd straw man, indeed—one in no way suggested or intimated by me), that it states no "federal standard," and so on. This is a curious failure to read history—one which, however, is apparently at the root of their difficulty in appreciating the existing federal rule. While there may be lurking constitutional overtones in the background, the federal law is shaped by statutory enactment based on easily understood principles, which reflect still important and widely held views of common sense and

fairness that a person should not be forced into litigation at a distance from his home. These appear in the First Judiciary Act of 1789 as provisions both of service, then termed "civil arrest," and of venue. The famous § 11, ch. 20, 1 Stat. 78, 79, after providing for diversity jurisdiction in the federal circuit courts in cases where the matter in dispute exceeds the sum of $500 and for their exclusive cognizance of crimes against the United States, continues: "But no person shall be arrested in one district for trial in another, in any civil action before a circuit or district court. And no civil suit shall be brought before either of said courts against an inhabitant of the United States, by any original process in any other district than that whereof he is an inhabitant, or in which he shall be found at the time of serving the writ, * * *." These provisions were continued in Rev.Stat. § 739, Judicial Code § 51, and in the former 28 U.S.C. § 112. During this period the requirements as to service and venue were treated together; but, as the Reviser's Notes state, they were separated in the recent revision of the Code, the venue requirements going to 28 U.S.C. § 1391 and the service requirements going to 28 U.S.C. § 1693.[4] This latter statute is completely ignored by my brothers, which may help to explain their error (in note 10 of the majority opinion) in saying that § 11 "has always been a venue provision and nothing more," as well as their difficulty in understanding this statutory background. It is true that § 1693 is expanded and also made less necessary by F.R. 4(f), as pointed out in First Flight Co. v. National Carloading Corp., supra, D.C.E.D.Tenn., 209 F.Supp. 730; but its continuance on the statute books is significant as emphasizing the durable federal policy it embodies.

That policy of course is the well known one going beyond venue requirements to require service within the district un-

---

4. 28 U.S.C. § 1693 reads as follows:
   "Except as otherwise provided by Act of Congress, no person shall be arrested in one district for trial in another in any civil action in a district court."

less specifically excepted by statute. Exception has been made in a limited number of instances, as stated in the opinion, involving antitrust, interpleader, and securities-regulation statutes. More lately limitations have been set by F.R. 4(f)—which has the force of statute. The first, a provision set in the original rule, was an extension of service of process throughout an entire state—applicable of course only in districts not coterminous with state boundaries—upheld in Mississippi Pub. Corp. v. Murphree, 326 U.S. 438, 446, 66 S.Ct. 242, 246, 90 L.Ed. 185, with the statement here most pertinent that "the rule is a rule of procedure and not of substantive right." Now the recent amendments to Rule 4(e) and (f), effective July 1, 1963, add two further provisions of relevance here, one providing for service according to state rules in proceedings quasi-in-rem, i. e., started by attachment or garnishment of property,[5] and the other for service not only throughout the state, but also upon additional parties not more than 100 miles from the place of commencement of the action or of trial, as well as persons ordered to respond to an order of commitment for civil contempt. 83 Sup.Ct. No. 7, p. 8; also 83 Sup.Ct. No. 11, p. LXI. Among the various important problems not faced by my brothers is that of adjusting their rule of state control to these new provisions; what law, for example, would govern the summons to the Southern District of New York of corporations doing some business in adjacent portions of Connecticut, New Jersey, or Pennsylvania?

It is true, of course, that the application of this principle of restriction of service to the district had to go through a course of development as to corporations, due to the historic controversy as to location or citizenship of a corporation. But this was settled long ago by the rather natural construction that a corporation must be "present," i. e., must be doing business, within the district to be subject to suit there. See, as examples of the settled law, Philadelphia & Reading Ry. Co. v. McKibbin, 243 U.S. 264, 37 S.Ct. 280, 61 L.Ed. 710; Robertson v. Railroad Labor Board, 268 U.S. 619, 45 S.Ct. 621, 69 L.Ed. 1119; and for full explanation and citation, Jaftex Corp. v. Randolph Mills, supra, 2 Cir., 282 F.2d 508, 512, and notes 2–4. And with this there has occurred the parallel development, as in New York, known to us all and outlined in Jaftex, of the state and federal law as to a corporation doing business within the district, but with the federal law getting its authority from this statutory background.

From all this I regard as quite clear and subject to dogmatic assertion that there is a federal law of statutory authority governing the requirements of service of process upon defendants, including corporations, within the district, and that this law, contrary to repeated assertions in the majority opinion, is quite well known and reasonably precise. Hence the concession in the opinion that the majority would accept a mandate from Congress "or its rule-making delegate" to settle this issue would seem directly applicable, for there exists just that mandate which the majority is rather blithely overriding. And the federal principle, as I have indicated, seems to me flexible and useful, making use of state developments under F.R. 4(d) (7); but avoiding the confusions and limitations inherent in any attempt to apply exclusively state law.[6] To those confusions and limitations I now turn.

---

5. These provisions seem to have received a mixed reception. See, e. g., Carrington, The Modern Utility of Quasi in Rem Jurisdiction, 76 Harv.L.Rev. 303 (1962); Abraham, Constitutional Limitations upon the Territorial Scope of Service of Federal Process, 32 F.R.D. 83; Elliott & Green, Quasi in Rem Jurisdiction in the Federal Courts: The Proposed Amendments to Rule 4, 48 Iowa L.Rev. 300 (1963). The debate also demonstates the durability of the policy of restriction.

6. The majority opinion appears to find great difficulty in how to treat removed cases. This issue is not before us and no definitive ruling is necessary, but I

It is significant that, while anouncing this broad fiat, my brothers avoid developing it in particular areas of difficulty. Thus they are hard put to find a meaningful distinction between state and federal law, and, after what, I submit, are strange suggestions as to the effect of recent Vermont statutes concerning service of process, finally dump the matter back into Judge Gibson's lap for solution. I have already indicated the quite obvious difficulties in applying any state principle to the extensions of service authorized by the new amendments of F.R. 4. But the area of applicability of the principle is left quite in doubt; the majority simply note the problem rather generally and leave it unsolved. Does their vaunted principle apply only to diversity cases, bearing in mind the considerable extent to which the federal question jurisdiction may turn on state law? For example, note the extent to which tax refund actions may turn up questions of state probate and estate law. Passing this, we have a considerable area where jurisdiction may well depend both on diversity and federal question jurisdiction. Note the question of unfair competition alleged as "pendent" to a federal case of trademark infringement. These are by no means imaginary difficulties, but are inherent in any attempt to break up expansive federal litigation into small state units and to apply differing rules of establishing jurisdiction as to each unit.

Over-all is the issue of national subservience to the divisive policies of the statute, a pattern of law at best belittling and undignified for the national courts and in all events inviting states to make invidious discriminations in favor of their own locals. True, the states to date have not been active in such discriminatory legislation, but the effect of the invitation now extended by my brothers may well be to stimulate such legislation on the part of states jealous of or ill disposed toward the national power. Here, as I develop below, I do not believe it conceivable that Vermont had in mind to prevent as full remedies for New Hampshire or Maryland citizens as for its own. But the opinion suggests that perhaps it is foolish or quixotic for a state not to do just that.

Contrary to assertions in the majority opinion, this is by no means the law of all the other circuits. In its eagerness to overprove its point, that opinion fails to note a most obvious part, namely, that the great majority of cases cited depend upon an explicit state statute made operative by F.R. 4(d) (7) authorizing service according to local state law. Thus in a federal case upholding service upon a foreign corporation by service upon the secretary of state under a state statute, it is obvious—there being no federal statute or rule directly authorizing such service—that the holding depends upon this cited rule and tells us absolutely nothing (unless by negative inference) about the supremacy of state service. A count of noses is not of supreme importance, since the Supreme Court must decide and, as we have already seen, our court has been known to go wrong in jumping too fast. But it is desirable to set the record straight; and in an appendix to this dissent, I make the more careful analysis which I think my brothers should have made before advancing their rather reckless version of the state of the precedents.[7]

Thus I cannot concur in a remand which directs Judge Gibson to work on a wholly undesirable concept as to the governing law. I would not object to a remand for the taking of evidence as to the defendant's doing business in Vermont, and for district court findings on this issue which we do not now have. But on the whole, this appears unnecessary,

do not see the difficulty or any attempt by two circuit judges to overrule *sub silentio* a decision of the Supreme Court, as well as one by Judge Learned Hand— concededly "no mean feat," were it ever to happen. See note 5 of the majority

opinion. Removal jurisdiction is admittedly derived jurisdiction, and I see no problem in holding it therefore dependent on the original state jurisdiction.

7. See Appendix, p. 242 infra:

since defendant in its affidavits has undoubtedly presented what it believes to be its strongest case; and on that I believe the service good under either federal or state law. It clearly appears that Miss McCaig, the agent served, is engaged full time in defendant's main business activities, to wit, those of discovering and processing the news of this entire state and region and then of distributing such news and others collected by United to the various outlets which the defendant serves in the state. This is much more than the mere soliciting of business as an agent for, say, a railroad or a resort hotel, to recall issues in other cases we have had. It is an integral part of the very business for which the defendant is created and has its existence. That its operation here is presently small in bulk is not due to the nature of the business, but to the limited press activities in the state—which may well disappear as Vermont becomes politically more lively and independent. The point is that they were such as the circumstances called for and thus did all the news-gathering business necessary to keep Vermont attuned to the other parts of defendant's far-flung operations. This, I believe, makes defendant amenable to service as here. See, e. g., Acton v. Washington Times Co., D.C.Md., 9 F. Supp. 74; Ricketts v. Sun Printing & Pub. Asso., 27 App.D.C. 222; International Shoe Co. v. State of Wash., Office of Unemployment Compensation and Placement, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, 161 A.L.R. 1057; Mississippi Pub. Corp. v. Murphree, 326 U.S. 438, 445, 446, 66 S.Ct. 242, 90 L.Ed. 185; Jacobowitz v. Thompson, 2 Cir., 141 F.2d 72; Nash-Ringel, Inc. v. Amana Refrigeration, Inc., D.C.S.D.N.Y., 172 F. Supp. 524; Ostow & Jacobs, Inc. v. Morgan-Jones, Inc., D.C.S.D.N.Y., 178 F.Supp. 150.

Further, while I welcome the views of Judge Gibson, sophisticated in Vermont law as he most certainly is, I cannot believe that there is enough doubt about this question to justify a remand. For the statutes dealing with service of foreign corporations, in my judgment, cannot possibly be found to represent a discriminatory or door-closing policy, as the majority imply. These statutes are clearly but a natural response to the stress which recent Supreme Court cases have placed on contacts with the forum state. See International Shoe Co. v. State of Wash., Office of Unemployment Compensation and Placement, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, 161 A.L.R. 1057; McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223; Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283. When the Vermont statutory law is read in the light of the admonitions of these cases, the restrictions of its terms to actions concerning Vermont residents and growing out of Vermont occurrences can be seen as a quite sound attempt on the part of the Vermont legislators to insure the statute's constitutionality by requiring that even the farthest reaches of the long-arm statute necessarily involve sufficient contacts with the forum state.[8] See, e. g., Smyth v. Twin State Improvement Corp., 116 Vt. 569, 80 A.2d 664. The fact that nonresidents are not mentioned in the Vermont statutes dealing with service of foreign corporations does not therefore show that Vermont wishes to afford a safe haven from suits by out-of-state plaintiffs to out-of-state corporations that conduct business there. Rather, it evidences a desire to save the constitutionality of a rather far-reaching statute. Thus Angel v. Bullington, 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832, and Woods v. Interstate Realty Co., 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524, have no more application here than they did in Jaftex for the reason stated therein, namely, that no clear and precise state policy would be frustrated by permitting suit in the federal forum. See Jaftex

---

8. For similar statutes in other states, obviously due to a like impulse, see, e. g., 6 Conn.Gen.Stat. § 33–411; Idaho Code (Supp.) § 5–514; 2 Ill.Rev.Stat. c. 110, § 17; Wash.Rev.Code § 4.28.185; Wis. Stat.Ann. (Supp.) § 262.05.

Corp. v. Randolph Mills, supra, 2 Cir., 282 F.2d 508, 514.

It is well, by way of summary, to consider what this opinion and decision actually accomplishes. In the case before us, it postpones decision for some months or years for interim proceedings which, in my judgment, can lead only to one conclusion already indicated, namely, that the court has jurisdiction under either federal or state law. Beyond that, in the realm of federal procedure, it rejects a uniform, flexible, and well understood federal rule for service of process for an uncertain, conflicting, and variable rule of state service, with an invitation to the states to develop discriminatory legislation against nonresidents. And yet further it nullifies attempts applauded by scholars to confine the Erie principle to its proper role of substantive rights without impairment of the integrity of the federal court organization; in so doing it casts doubt upon the validity of the well-conceived and hitherto highly successful steps to improve the administration of justice in the federal system and indeed generally. Surely this is a heavy price to pay to register disagreement with a disliked decision before the issue can get to the Supreme Court.

So I dissent from the steps taken to deny jurisdiction here.

### APPENDIX

In supporting their claim to the unanimous support (except for Jaftex) of the rule they now enunciate, my brothers have made the obvious, but telling, mistake of ignoring the important distinction between service pursuant to F.R. 4(d) (3) and that pursuant to F.R. 4 (d) (7). The latter permits actions to be commenced in federal courts by service of process on a foreign corporation in the manner prescribed by the law of the forum state. It would seem needless to say, had not the majority missed the point, that state law must of course be looked to in determining whether a defendant served pursuant to a state statute is properly before the court. So cases applying state law under F.R. 4(d) (7) have no relevance at all to the issue at hand, but show merely that the Federal Rules provide an alternative to the manner of service prescribed by F.R. 4 (d) (3)—the rule to which the Jaftex doctrine applies and which is the only one of the rules here in issue. Yet the majority repeatedly wrest from context quotations from F.R. 4(d) (7) cases which are then presented as acclaim for their position.

Thus in Pulson v. American Rolling Mill Co., 1 Cir., 170 F.2d 193, quoted approvingly, and in the very recent case also cited, Waltham Precision Instrument Co. v. McDonnell Aircraft Corp., 1 Cir., 310 F.2d 20, service was made on the Massachusetts Commissioner of Corporations and Taxation under the provisions of Mass.Gen.Laws ch. 181, § 3A, which provides for substituted service on a foreign corporation that "does business" in the Commonwealth. In such cases there is necessarily (a) question whether the service comports with the state requirements for holding a foreign corporation responsible to the laws of the state, and (b) whether these state requirements satisfy the commands of the United States Constitution. But to say this much is still to say nothing about the case in which service is made pursuant to F.R. 4(d) (3), rather than under a special state statute. Thus in all fairness we must disregard the deliberations of the First Circuit as immaterial to the issue which confronts us here.

The same is true of the Fifth Circuit cases which the majority cite. Connor v. New York Times Co., 5 Cir., 310 F.2d 133, reversing a previous decision, 5 Cir., 291 F.2d 492, concerned service on the defendant under the Alabama Substituted Service Statute, 2 Ala.Code 1940 (1955 Cum.Supp.) tit. 7, § 199(1), which provides that a foreign corporation appoints the secretary of state as process agent by "doing business" in Alabama. In Stanga v. McCormick Shipping Corp., 5 Cir., 268 F.2d 544, 548, the Fifth Circuit Court of Appeals clearly recognizes the distinction between F.R.

4(d) (3) and F.R. 4(d) (7), which has eluded my brothers. That court starts its discussion of the jurisdictional problem in that case by observing about the person served:

"As Holmes clearly was not a person described in F.R.Civ.P. 4(d) (3), 28 U.S.C.A. validity of the service of process depends wholly on it'having been 'served * * * in the manner prescribed by the law of the state in which the service is made for the service of summons * * * upon any such defendant * * *.'

"Thus have we come face to face with the law of Louisiana. * * *"

The language quoted by the Fifth Circuit is, of course, that of F.R. 4(d) (7); the law of Louisiana becomes important when the court determines that F.R. 4(d) (3) is not applicable and turns to F.R. 4 (d) (7). The statement quoted by my brothers to show support for them from the Fifth Circuit was, as one might guess, taken from the court's discussion of Louisiana law which followed the above quotation.

The majority's pretentions of appellate support in the Eighth, Ninth, and Tenth Circuits are equally unjustified. Electrical Equipment Co. v. Daniel Hamm Drayage Co., 8 Cir., 217 F.2d 656, involved service made in accordance with Iowa Code Ann. § 494.2, subd. 6—another statute making the secretary of state process agent for foreign corporations that do business on the forum state. In L. D. Reeder Contractors of Ariz. v. Higgins Industries, Inc., 9 Cir., 265 F.2d 768, the court, without discussion of this issue, looked to general law to decide whether the foreign corporation there did sufficient business in California to sustain service of process. Finally, in Steinway v. Majestic Amusement Co., 10 Cir., 179 F.2d 681, 18 A.L.R.2d 179, cert. denied 339 U.S. 947, 70 S.Ct. 802, 94 L.Ed. 1362, service was made upon the secretary of state pursuant to Okla.Stat.Ann. § 1.17. The court in that case explicitly recognized that it was proceeding under F.R. 4(d) (7).

The Sixth Circuit is admittedly regarded as at least tacitly in agreement with the Jaftex principle. See, e. g., First Flight Co. v. National Carloading Corp., D.C.E.D.Tenn., 209 F.Supp. 730, 735 n. 11 and accompanying text (opinion of Judge Frank W. Wilson approving of Jaftex); Shuler v. Wood, D.C.E.D.Tenn., 198 F.Supp. 801, 803 (opinion of Chief Judge Robert L. Taylor disapproving of Jaftex, with which he finds his Court of Appeals in seeming agreement); Paragon Oil Co. v. Panama Refining & Petrochemical Co., D.C.S.D.N.Y., 192 F.Supp. 259, 261. The Sixth Circuit cases which indicate that the Court of Appeals there is allied with the Jaftex majority are Lasky v. Norfolk & W. Ry. Co., 6 Cir., 157 F.2d 674, where the court in a Per Curiam opinion without mention of the Ohio statute and looking to general law upheld service on the manager of the defendant's coal bureau at its Cleveland office; Bach v. Friden Calculating Mach. Co., 6 Cir., 167 F.2d 679, 680, where the court explicitly recognized F.R. 4(d) (7) as an alternative manner of service to that prescribed by F.R. 4(d) (3), and, having noted an Ohio statute, Ohio Gen.Code § 11290, which provided to much the same effect as F.R. 4(d) (3), looked to both general and Ohio law to reverse a lower court order to quash the service on the managing agent of defendant's Cincinnati office; and Scholnik v. National Airlines, 6 Cir., 219 F.2d 115, 120, cert. denied National Airlines v. Scholnik, 349 U.S. 956, 75 S.Ct. 882, 99 L.Ed. 1280, where the court again recognized the distinction between F.R. 4(d) (3) and F.R. 4(d) (7) and found that "under either the Federal or State provision" the service in question was sustainable. WSAZ, Inc. v. Lyons, 6 Cir., 254 F.2d 242, is in no way inconsistent with the above decisions, as my brothers seem to imply, for not only did the action come to the federal courts by removal, but in addition it involved service upon the secretary of state pursuant to Ky.Rev.Stat. §§ 271.385 and 271.610. Thus it was appropriate for the court in that case to have regard for Kentucky law.

Only the District of Columbia Court of Appeals has considered the disputed issue in Jaftex since it was decided, and that court took the not unusual course of expressly ruling on both local and federal grounds. Fiat Motor Co. v. Alabama Imported Cars, Inc., 110 U.S.App.D.C. 252, 292 F.2d 745, cert. denied 368 U.S. 898, 82 S.Ct. 175, 7 L.Ed.2d 94. See also the concurring opinion in Mutual International Export Co. v. Napco Industries, Inc., D.C.Cir., 316 F.2d 393, well stating the distinction in service under the two rules. The Fourth Circuit Court of Appeals has remained silent on this issue; and the district court case, Easterling v. Cooper Motors, Inc., D.C.M.D. N.C., 26 F.R.D. 1, on which my brothers base their claim to the Fourth Circuit, was explicitly one under F.R. 4(d) (7), service having been pursuant to N.C. Gen.Stat. § 1–97.

Thus all that fairly remains of the majority's assertion of universal acclaim for their position is a divided Court of Appeals in the Third Circuit, Partin v. Michaels Art Bronze Co., 3 Cir., 202 F. 2d 541, and the Seventh Circuit, Canvas Fabricators, Inc. v. William E. Hooper & Sons Co., 7 Cir., 199 F.2d 485.

SMITH, Circuit Judge (concurring).

While I do not share the doubts as to Vermont's constitutional power to give its courts jurisdiction over this claim, and incline to the belief that such jurisdiction would be asserted here, Somerville Lumber Co. v. Mackres, 86 Vt. 466, 85 A. 977 (1913), I agree that Angel v. Bullington, 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832 (1947) and Woods v. Interstate Realty Co., 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524 (1949), look toward application of state standards as to amenability to suit, at least in diversity cases such as this. I also agree that it is desirable that the District Judge, experienced in Vermont Law, pass upon the Vermont law issue in the first instance, and that he should dispose first of the issues of jurisdiction and venue before considering whether a claim has been stated on which relief may be granted, all on the present complaint and affidavits or such amplification as he may see fit to allow.

WATERMAN, Circuit Judge (concurring).

I concur in the result reached by the majority of my colleagues. I join in the vacation of the order of the court below so that it will be clear that the learned district judge consider the questions of jurisdiction and of venue. I share with Judge Smith the belief that Vermont has constitutional power to give its courts jurisdiction over this claim, and I am of the opinion that such jurisdiction would have been asserted here if the case had been brought in a Vermont state court.