**Thelma SCHOLNIK, Appellant,**

v.

**NATIONAL AIRLINES, Inc., Appellee.**

**No. 12170.**

United States Court of Appeals, Sixth Circuit.

Feb. 4, 1955.

Ralph Rudd, Cleveland, Ohio, Marvin C. Harrison, Harrison, Spangenberg & Hull, Cleveland, Ohio, on brief, for appellant.

Edward D. Crocker, Cleveland, Ohio, Arter, Hadden, Wykoff & VanDuzer, Cleveland, Ohio, on brief, for appellee.

Before ALLEN, McALLISTER and MILLER, Circuit Judges.

MILLER, Circuit Judge.

The appellant, Thelma Scholnik, a citizen of Ohio, filed this action in the District Court for the Northern District of Ohio against National Airlines, Inc., a Florida corporation, to recover damages in the amount of $40,000 for personal injuries sustained on or about June 11, 1951 while a passenger in a National Airlines plane while the plane was over Florida in flight from Havana, Cuba, to Miami, Florida. The complaint alleged that the injuries resulted from being thrown out of her seat into the aisle by reason of the negligent operation of the plane. The District Judge sustained appellee's motion to quash service of summons and to dismiss the complaint, holding that the appellee was not doing business in Ohio, that the summons was not served on an authorized agent of the appellee, and that the District Court in Ohio had no jurisdiction over it. This appeal followed.

The facts are not in dispute and are shown by affidavits, a deposition and documentary evidence to be as follows: National Airlines, Inc., hereinafter referred to as National, is engaged in the business of transporting passengers by airplane. It has certificates from the Civil Aeronautics Board for operation over routes from New York to Miami, Florida, from Jacksonville and Tampa, Florida to New Orleans, Louisiana and from Tampa to Havana, Cuba. It operates no flights into the State of Ohio and maintains no office in Ohio. Some of its planes operating from the south into Washington, D. C. are thereafter flown from Washington into Cleveland, Ohio, under an Equipment Interchange Leasing Agreement, hereinafter referred to as the Lease, entered into between National and Capital Airlines, Inc., hereinafter called Capital. Capital is a Delaware corporation, separate and distinct from National, is neither a parent nor a subsidiary corporation to National, and, unless made so by the Lease, is not the servant or employee of National.

The Lease has this factual base. National does not operate any flight to the northwest of Washington. Capital operates a flight from the northwest (Cleveland, Ohio) into Washington but not to the south thereof. During the summer six months, May through October, Capital's business increases and it becomes short of equipment. National has equipment which it can furnish to Capital during this period. In the winter months, November through April, when Capital's business falls off, it has excess equipment which it can furnish to National. The leasing of such equipment by one to the other enables the two lines to operate continuous through flights between Cleveland and Miami or Havana, stopping at Washington. Under the Lease, a National plane, after arriving at Washington from the South, is leased, together with its National operating crew, to Capital, and then continues on to Cleveland over the Capital route. Similarly, a Capital plane after arriving in Washington from Cleveland, is leased, together with its Capital operating crew, to National, and then continues south over the National route. Through tickets

are sold by each line, which show that the trip northwest of Washington was being made by Capital, and that the trip south of Washington was being made by National. Such through transportation is advertised by Capital out of its Cleveland office.

The Lease, entered into on June 2, 1950, was subject to, and became effective only on, approval by the Civil Aeronautics Board, and was so approved. It provided that from November 1st to April 30th of each year Capital would lease certain aircraft and flight crews to National, and from May 1st to October 31st of each year National would lease certain aircraft and flight crews to Capital, the leases being for the purpose of providing through service on such of the schedules of the parties thereto connecting at Washington as the parties shall determine by mutual agreement. The lease of the aircraft and flight crews became effective upon delivery of the aircraft in question by the owner to the lessee, and the lease terminated upon the delivery of the aircraft by the lessee to the owner. Such delivery was ordinarily to be made immediately after the aircraft arrived at the ramp at the airport then serving the city of Washington. A written receipt describing the aircraft and the time of such delivery was executed by the receiving carrier.

The Lease provided:

"Each party shall have the exclusive right, subject to the orders of the Civil Aeronautics Board, to fix the scheduled stops to be made on its routes, and nothing contained in this agreement shall be construed to grant either party any right whatever (a) to determine whether any flight of the other party shall be operated or cancelled in whole or in part or (b) to exercise any control over any operation or business or affairs of or interest in the other party, except as may be specifically provided for herein or as may be an incident of this agreement.

"Flights with planes leased under the terms of this agreement shall be under the absolute operational control of the lessee during the period of the lease, and the leased flight crews shall be under the exclusive operational control of the lessee during the period of the lease. * * *

"The lessor of aircraft and equipment hereunder shall make such change in the radio equipment in its aircraft as to conform to the assigned frequencies of the lessee."

The Lease also contained the following provisions: The lessor was responsible for loss of or damage to its aircraft and equipment while leased to the other, except that the lessee would be liable to the lessor for such loss or damage as (1) occurred when the aircraft was on the ground and not taxiing in or out with respect to a flight, and (2) occurred as a result of negligence on the part of the lessee or its employees. Each party would at all times maintain appropriate insurance covering its responsibilities for loss of or damage to aircraft while under lease. The lessee was to keep in full force and effect at its expense insurance insuring both itself and the other party, as their respective interests might appear, against liability for injuries to or deaths of passengers and third parties, and damage to property caused by the operation or possession of such aircraft. The lessee agreed to indemnify the other party during the period in which it had possession of the aircraft against all damage or claims caused by the operation or possession of such aircraft.

The Lease contained lengthy and detailed provisions with respect to the rental for leased aircraft and flight crews. In general, certain types of expense, measured in cents per revenue mile, were allocated to each airline, (1) when operating as lessee and (2) when operating as lessor. The lessee was to keep an accurate record of the revenues generated by the leased aircraft on the mileage operated under lease. The lessor and lessee would each receive such proportion of such revenues as their respective expenses per plane mile bore to the total expenses per plane mile, which division would be continued until the lessor

and lessee each recovered their expenses. In the event the flights with leased equipments resulted in revenues above the expenses of both lessor and lessee, the excess of such revenues was to be divided 45% to the lessor and 55% to the lessee.

█ Historically, the jurisdiction of a court to render a judgment in personam against a defendant depended upon the presence of the defendant within the territorial jurisdiction of the court. Pennoyer v. Neff, 5 Ott. 714, 95 U.S. 714, 24 L.Ed. 565. The strictness of that rule has given way somewhat to the present view that due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. International Shoe Co. v. State of Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95; Milliken v. Meyer, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278.

With respect to a corporation, its presence without the state of its origin is manifested only by activities carried on in its behalf by those who are authorized to act for it. As said in International Shoe Co. v. State of Washington, supra [326 U.S. 310, 66 S.Ct. 159],—"It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative. The test is not merely, as has sometimes been suggested, whether the activity, which the corporation has seen fit to procure through its agents in another state, is a little more or a little less. (Cases cited.) Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure. That clause does not contemplate that a state may make binding a judgment in personam against an individual

or corporate defendant with which the state has no contacts, ties, or relations." See also, Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485.

In support of her contention that National has the necessary minimum contacts with the State of Ohio to confer jurisdiction over it in Ohio, appellant relies on the actual operation of National's planes by National crews in Ohio and on the activities of Capital in Ohio in advertising the Capital-National through flight to Miami, the sale of through tickets by it in Cleveland together with other services incidental thereto, and the benefits resulting to National through such activities on its behalf in Ohio. Appellee contends that by reason of the Lease, which is a validly executed contract between two separate, independent corporations and must be recognized, it is not operating any planes in Ohio, and that the activities of Capital on its behalf in Ohio are no more than those considered by the Supreme Court in analogous cases involving connecting railroad carriers. In such cases, the Supreme Court ruled that such activities by a connecting carrier within the jurisdiction did not confer jurisdiction over the foreign corporate carrier who, although receiving benefits therefrom, did not itself operate within the state. Green v. Chicago, Burlington and Quincy R. Co., 205 U.S. 530, 27 S.Ct. 595, 51 L.Ed. 916; Philadelphia & Reading R. Co. v. McKibbin, 243 U.S. 264, 37 S.Ct. 280, 61 L.Ed. 710.

Appellant contends that the net overall effect of the numerous provisions of the Lease is not to create the relation of lessor and lessee, but rather the relation of participants in a joint enterprise, which eliminates the claimed insulating effect of the alleged lease.

We are of the opinion that the rule applied in the Green and McKibbin cases has been materially changed by later decisions of the Supreme Court. In Lasky v. Norfolk & W. Ry. Co., 6 Cir., 157 F.2d 674, we considered a situation similar to those in the Green and McKibbin cases

in the light of the Supreme Court's opinion in International Shoe Co. v. State of Washington, supra. On the authority of that case we held that the defendant carrier, although a foreign corporation with no part of its lines located in the Northern District of Ohio, and although it made no contracts, issued no bills of lading and sold no tickets in the Northern District, was nevertheless doing business in the district and subject to service of process therein, by reason of the extensive and continuous solicitation of business by it in the district. In our opinion, such activity on its behalf within the district supplied the minimum contacts on the part of the corporation with the state of the forum as to make it reasonable to require the corporation to defend a particular suit brought in that district. See also: Bach v. Friden Calculating Machine Co., 6 Cir., 167 F.2d 679; Frene v. Louisville Cement Co., 77 U.S.App.D.C. 129, 134 F.2d 511.

The effect of International Shoe Co. v. State of Washington, supra, has been referred to by numerous district court cases, the following of which represent the strongly prevailing view that the earlier rulings of the Supreme Court in the Green and McKibbin cases are no longer a correct statement of the law. Willett v. Union Pac. R. Co., D.C.N.D. Ohio, 76 F.Supp. 903; Perkins v. Louisville & N. R. R. Co., D.C.S.D.Cal., 94 F. Supp. 946; Bonesteel v. Steelco Stainless Steel, D.C.N.D.Ohio, 97 F.Supp. 985; Star Elkhorn Coal Co. v. Red Ash Pocahontas Coal Co., D.C.E.D.Ky., 102 F. Supp. 258; Cooke v. Kilgore Mfg. Co., D.C.N.D.Ohio, 105 F.Supp. 733; Healing v. Isbrandtsen Co., D.C.S.D.N.Y., 109 F. Supp. 605; Krnach v. Electro Lift, D.C. N.D.Ohio, 13 F.R.D. 131.

In Travelers Health Ass'n v. Commonwealth of Virginia, 339 U.S. 643, 70 S.Ct. 927, 929, 94 L.Ed. 1154, the Supreme Court applied its new concept of "doing business" by a foreign corporation to a corporation which had no office or paid soliciting agent in Virginia but issued a substantial number of health insurance policies to residents in that state through use of the mail. It held that metaphysical concepts of "implied consent" and "presence" in a state were not controlling, and "where business activities reach out beyond one state and create continuing relationships and obligations with citizens of another state, courts need not resort to a fictional 'consent' in order to sustain the jurisdiction of regulatory agencies in the latter state."

For the purposes of the present ruling, it is unnecessary to determine the exact legal effect of the provisions of the Lease. A valid lease by National of its planes and crews to Capital is only a part of the picture. Under the decisions above referred to it is not necessary that National operate its planes in Ohio in order to be treated as being present in Ohio. In many of the activities performed by Capital in its Cleveland office with respect to the through flights, it is acting for National and with authority from National to so act. In addition to solicitation of business it makes the actual contracts of carriage over National's lines with residents of Ohio and collects payment therefor. In such activities, agency clearly exists. Even though the actual cost of such service may not be charged directly or indirectly to National in the mutual accounting provided by the Lease, compensation for such agency services would be found in the performance of similar services for Capital by National in National's southern offices. Such activities on behalf of National, coupled with operations under the Lease, with resulting benefits to National, carried on continuously over a period of years as a regular part of National's business, in our opinion furnish the necessary minimum contacts with the Ohio forum so that the maintenance of a suit against it in that forum does not offend " 'traditional notions of fair play and substantial justice.' " International Shoe Co. v. Washington, supra; Travelers Health Ass'n v. Virginia, supra; Lasky v. Norfolk & W. Ry. Co., supra.

**120**

Summons was served on National by delivery to the District Sales Manager of Capital in Cleveland. A second summons was served on Robert Denton who was a pilot of a National plane under lease to Capital at the Cleveland airport.

Rule 4(d) (3), Federal Rules of Civil Procedure, 28 U.S.C., provides for service upon a foreign corporation by delivery of the summons and complaint to "a managing or general agent". Rule 4 (d) (7) also authorizes service upon a foreign corporation "in the manner prescribed by the law of the state in which the service is made". Sec. 11290 of the Ohio General Code, in effect at the time, provides: "When the defendant is a foreign corporation, having a managing agent in this state, the service may be upon such agent." It is not required under either the Federal or State provision that the agent served be the general agent or general manager of defendant's business in the state. It is sufficient if he is "a managing" agent. Based upon our ruling that National was doing business in Ohio by reason of its relations with Capital, delivery of process to the District Sales Manager of Capital was a valid service. Bach v. Friden Calculating Machine Co., supra; Toledo Computing Scale Co. v. Computing Scale Co., 6 Cir., 142 F. 919; Beach v. Kerr Turbine Co., 6 Cir., 243 F. 706, 709; Bomze v. Nardis Sportswear, 2 Cir., 165 F.2d 33, 37.

The ruling of the District Judge was influenced in part by a consideration of the unreasonable burden upon appellee in requiring it to defend the suit in the Ohio forum. Our ruling does not necessarily have that result. Whether the case should be transferred to a more convenient forum under the provisions of Sec. 1404(a), Title 28 U.S.Code is not involved in this ruling and is still a matter for the consideration of the District Court.

The judgment is reversed and the case remanded to the District Court for further proceedings consistent with the views expressed herein.