Mary SCANAPICO, Plaintiff-Appellee,

v.

RICHMOND, FREDERICKSBURG & POTOMAC RAILROAD COMPANY, Defendant-Appellant,

and

Seaboard Air Line Railroad Company and Atlantic Coast Line Railroad Company, Defendants.

No. 633, Docket 34256.

United States Court of Appeals, Second Circuit.

Argued March 25, 1970.

Decided July 16, 1970.

On Rehearing In Banc Dec. 18, 1970.

Irving R. Kaufman, Circuit Judge, concurred in result and filed an opinion.

Hays, Circuit Judge, concurred in result and filed an opinion in which Feinberg, Circuit Judge, joined.

Lumbard, Chief Judge, dissented and filed an opinion.

William M. Kimball, New York City (Burlingham, Underwood, Wright, White & Lord, New York City, on the brief), for defendant-appellant.

Dominic J. Lodato, Brooklyn (Hauptman & Lodato, Brooklyn, on the brief), for plaintiff-appellee.

Before LUMBARD and HAYS, Circuit Judges, and BLUMENFELD, District Judge.*

HAYS, Circuit Judge:

This is an appeal from an order of the United States District Court for the Eastern District of New York denying defendant's motion to quash the service of summons. It is here by permission of this court, granted upon the statement of the district judge under 28 U. S.C. § 1292(b) (1964) that the order

"[i]nvolves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation. * * *"

Appellee sued for injuries sustained when a suitcase fell on her from an overhead rack in a railroad car in which she was a passenger traveling from Florida to New York. Appellee is a resident of New York. The injury occurred when the train was traveling over the tracks of appellant railroad between Washington and Richmond.

Appellant moved to quash the service on it of the summons and complaint on the ground that its activities in New

* Of the District of Connecticut, sitting by designation.

York were insufficient, under the due process clause of the Federal Constitution and under New York law, to provide a basis for the exercise over it of personal jurisdiction and on the further ground that such an assertion of jurisdiction would constitute an undue burden on interstate commerce. It is from the order denying this motion that defendant appeals.

The parties are agreed, and the district court found, that the activities of the appellant in New York consisted of:

(1) freight solicitation by two employees, one of whom resided in New York;

(2) sale and issuance by connecting railroads of coupon tickets and through bills of lading good, in part, for carriage over appellant's Richmond-Washington tracks, for which appellant received a share of the payment;

(3) daily presence in New York of appellant's freight cars in interstate trains operated by connecting railroads.

Under recent opinions of the Supreme Court the older mysteries of corporate presence are no longer determinative of issues of personal jurisdiction over corporations. The question in each *case is not whether the corporation is in* some metaphysical sense "present" in the state but whether the corporation's contacts with the state are sufficient to justify the exercise of jurisdiction without offending "traditional notions of fair play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945), citing Milliken v. Meyer, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940). With increasing nationalization of commerce "a trend is clearly discernible toward expanding the permissible scope of state jurisdiction over foreign corporations and other non-residents." McGee v. International Life Insurance Co., 355 U.S. 220, 222, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957).

We are warned, however, that

"[I]t is a mistake to assume that this trend heralds the eventual demise of all restrictions on the personal jurisdiction of state courts. *See* Vanderbilt v. Vanderbilt, 354 U.S. 416, 418. [77 S.Ct. 1360, 1362, 1 L.Ed.2d 1456.] Those restrictions are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States. However minimal the burden of defending in a foreign tribunal, a *defendant may not be called upon to* do so unless he has had the 'minimal contacts' with that State that are a prerequisite to its exercise of power over him." Hanson v. Denckla, 357 U.S. 235, 251, 78 S.Ct. 1228, 1238, 2 L.Ed.2d 1283 (1958).

Whether the "assertion of jurisdiction contravenes a constitutional guarantee" is, of course, a question of federal law. See Arrowsmith v. United Press Internat'l, 320 F.2d 219, 223 (2d Cir. 1963).

In the present case, it appears that the appellant employed a resident of Syracuse, New York, to solicit freight traffic throughout the State except for the area immediately around New York City, where another employee of appellant solicited such freight. At all times freight cars belonging to appellant were to be found in New York. Tickets and bills of lading for carriage over appellant's tracks were sold by persons acting, for this purpose, as appellant's representatives. We hold that these activities of appellant in the State constitute sufficient "minimum contacts" to permit, within constitutional limitations, *the exercise of personal jurisdiction.* McGee v. International Life Insurance Co., *supra*; Perkins v. Benguet Consolidated Mining Co., 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952); International Shoe Co. v. Washington, *supra*; Curtis Publishing Co. v. Golino, 383 F.2d 586 (5th Cir. 1967); Volkswagen Interamericana, S.A. v. Rohlsen, 360 F.2d 437 (1st Cir.) cert. denied, 385 U.S. 919, 87 S.Ct. 230, 17 L.Ed.2d 143 (1966); Scholnik v. National Airlines, 219 F.2d 115 (6th

Cir.) cert. denied, 349 U.S. 956, 75 S.Ct. 882, 99 L.Ed. 1280 (1955).

In Blount v. Peerless Chemicals Inc., 316 F.2d 695 (2nd Cir.), cert. denied sub nom. Colbert v. Peerless Chemicals Inc., 375 U.S. 831, 84 S.Ct. 76, 11 L.Ed.2d 62 (1963), where we held the activities within the state of New York of a foreign corporation insufficient to provide a basis for the exercise of jurisdiction, we pointed out that the corporation involved in that case did not solicit business in New York and had no employees here. In contrasting the present case with *Blount* we might add that in *Blount* the corporation did not have representatives in New York who sold its services and did not have property in New York.[1]

In this case where federal jurisdiction is based upon diversity of citizenship we must also determine whether personal jurisdiction is properly asserted under New York law. Arrowsmith v. United Press Internat'l, *supra*. The applicable New York statute is Section 301 of the New York Civil Practice Law and Rules (McKinney's 1963). In Frummer v. Hilton Hotels Internat'l, Inc., 19 N.Y.2d 533, 281 N.Y.S.2d 41, 227 N.E.2d 851 (1967), the Court of Appeals, interpreting Section 301, held that a plaintiff who alleged that he was injured in the Hilton Hotel in London could establish personal jurisdiction in New York over the British corporation which operated the London Hilton. New York's highest court, reasserting its familiar rule that solicitation of business in the state without more is insufficient to provide a basis for personal jurisdiction, found the necessary additional activities in the corporation's use of a New York representative to make reservations at the London Hilton and to do "public relations and publicity work." 19 N.Y.2d at 537, 281 N.Y.S.2d at 44, 227 N.E.2d at 853.

In Gelfand v. Tanner Motor Tours, Ltd., 385 F.2d 116 (2d Cir. 1967), cert. denied, 390 U.S. 996, 88 S.Ct. 1198, 20 L.Ed.2d 95 (1968), this court was called upon to apply the New York law with respect to the exercise of personal jurisdiction over a foreign corporation. Plaintiffs brought suit in the United States District Court for the Eastern District of New York against two California corporations and a Nevada corporation, alleging that plaintiffs sustained injuries while traveling on a bus in Arizona. The district court granted defendants' motion to set aside the service of summons and plaintiffs appealed. The district court's decision antedated the decision of the New York Court of Appeals in the *Frummer* case. Relying largely on *Frummer* which had been decided in the meantime, we reversed the determination of the district court and held that plaintiffs had acquired personal jurisdiction over defendants. In an opinion by Chief Judge Lumbard, this court said:

"In our view, the decisive test is that upon which the court in *Frummer* relied, 'the [reservation] Service does all the business which [defendant corporation] could do were it here by its own officials.' 281 N.Y.S.2d at 44, 227 N.E.2d at 854. In the context of the *Frummer* case, we take this to mean that a foreign corporation is doing business in New York 'in the traditional sense' when its New York representative provides services beyond 'mere solicitation' and these services are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services." Gelfand v. Tanner Motor Tours, Ltd., *supra*, at 120–121.

In the *Gelfand* case, a representative of defendant corporations confirmed reservations for bus tours on defendants' lines and promoted travel over those lines.

---

1. On the effect of the use of appellant's freight cars in New York, compare the issue of the ownership of the trucks involved in Agrashell, Inc. v. Bernard Sirotta Co., 344 F.2d 583, 589–590 (2d Cir. 1965).

In the present case not only did appellant's solicitation of business in New York provide a much more acceptable basis for establishing personal jurisdiction than the "mere solicitation" referred to in the New York cases, since the solicitation was carried on by appellant's own employees, one of whom resided in Syracuse, but the additional factors seem to us to be at least as extensive as those found to be sufficient in *Frummer* and *Gelfand*. These additional factors include, as we have pointed out, sale by representatives within the state of passage over appellant's tracks and the *day-to-day* presence within the state of appellant's freight cars from the use of which the appellant was deriving revenue.

Appellant also contends that the assertion of jurisdiction over it in New York imposes an undue burden on interstate commerce. The cases which appellant cites hark back to earlier days and reflect a far less fully developed stage of our national economy. In McGee v. International Life Insurance Co., *supra*, the Court said, 355 U.S. at p. 223, 78 S. Ct. at p. 201:

"* * * modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity." [2]

In the *Frummer* case the New York Court of Appeals said:

"We are not unmindful that litigation in a foreign jurisdiction is a burdensome inconvenience for any company. However, it is part of the price which may properly be demanded of those who extensively engage in [interstate] trade. When their activities * * * either directly or through an agent, become as widespread and energetic as the activities in New York conducted by [defendant], they receive considerable benefits from such * * * business and may not be

heard to complain about the burdens." Frummer v. Hilton Hotels Internat'l, Inc., 19 N.Y.2d at 538, 281 N.Y.S.2d at 45, 227 N.E.2d at 854.

We reject appellant's contention that subjecting it to personal jurisdiction in New York imposes an undue burden on interstate commerce.

For the reasons given we affirm the determination of the district court.

LUMBARD, Chief Judge:

I dissent.

The result of the majority opinion would be to permit suits in the New York federal courts regarding injuries suffered on the tracks of almost every railroad operating in the United States, and occurring almost anywhere in the United States.

Mary Scanapico, a resident of New York, alleges that she was injured when a suitcase fell on her from an overhead luggage rack during a train trip from Miami to New York City while she was riding over the tracks of the Richmond, Fredericksburg & Potomac Railroad (RF&P) somewhere between Washington and Richmond. The RF&P was served with process in Richmond and moved to quash service on the grounds that it violated due process and imposed an unconstitutional burden on commerce. The district court found that RF&P had but three contacts with the State of New York: (1) New York freight solicitation, in part by a New York resident; (2) sale and/or issuance in New York by connecting rail carriers of coupon tickets and through bills of lading good, in part, for carriage over defendant's Richmond-Washington tracks, for which defendant receives appropriate payment; and (3) daily presence in New York of defendant's freight cars in interstate trains operated by connecting carriers. The majority finds that these factors alone are sufficient to constitute "doing business" under New York C.P.

---

2. Whether some other forum may be more convenient for trial is not before us. Presumably defendant will be able to move for transfer to another forum under 28 U.S.C. § 1404(a) (1964).

L.R. § 301 and constitute sufficient contacts with the state so that no undue burden on interstate commerce results. I respectfully disagree.

RF&P operates a railroad between Washington, D. C. and Richmond, Virginia, controlling no railroad operations beyond those points. None of its operating employees works north of Washington or south of Richmond. Aside from its employee in Syracuse, who solicits freight traffic in upstate New York, RF&P has none of the traditional indicia of corporate presence in New York. It has no New York office, address, telephone listing, bank account, tangible or intangible property.

The standards for obtaining personal jurisdiction over non-residents have moved from the rigid rule of Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565 (1877) to the more flexible standard of International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). These developments, however, have not heralded the ultimate demise of all restrictions on the personal jurisdiction of the courts. As Chief Justice Warren stated in Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958):

> "Those restrictions are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States. However minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the 'minimal contacts' with that State that are a prerequisite to its exercise of power over him. * * *" 357 U.S. at 250–251, 78 S.Ct. at 1238.

The Court also indicated that one test to be applied was whether there was "some act by which the defendant purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefit and protections of its laws." 357 U.S. at 253, 78 S.Ct. at 1240.

In determining whether RF&P has the requisite "minimal contact" with New York, the majority opinion and the district court indicated that the classic indicia of corporate presence, must yield to the realities of significant and purposeful economic presence in the State. Even accepting this formulation, I am unable to discover the "significant and purposeful" economic presence which the district court and the majority opinion find to exist here.

In Blount v. Peerless Chemicals Inc., 316 F.2d 696 (2 Cir.), cert. denied, sub nom. Colbert v. Peerless Chemicals Inc., 375 U.S. 831, 84 S.Ct. 76, 11 L.Ed.2d 62 (1963) we formulated a test for determining the propriety of jurisdiction, concluding that

> "[t]he two fundamental factors determinative of the propriety of personal jurisdiction appear to be the nature and extent of the business activities conducted by and on behalf of the foreign corporation in the forum state, and the relationship to that state and those activities to the cause of action. Thus, a corporation which expends money, time, and effort extensively within a state, thereby exercising the privilege of dealing with its residents, may receive considerable economic benefit; * * *" 316 F.2d at 697.

RF&P certainly does not spend extensive money, time or effort in New York State by virtue of the three factors relied upon by the majority.

The daily presence in New York of freight cars belonging to RF&P is given great weight by the majority. However, the fortuity of when an RF&P car is in New York is hardly sufficient basis to find that it is engaging in some "purposeful" activity in the State. RF&P has no choice but to allow its freight cars to be brought into New York by other carriers and lines. This free interchanging of cars was not always the case for

> "In the early days of railroading in this country no railroad allowed its freight cars to leave its rails.

Through freight to be transported over more than one line was unloaded and reloaded at junction points. With the development of more efficient transportation methods following the Civil War this wasteful and time-consuming practice of transferring cargo was gradually abandoned and for a charge the railroads began to permit their loaded cars to move off their tracks onto the tracks of connecting carriers. * * *" Boston and Maine RR v. United States, 162 F. Supp. 289, 291 (D.Mass. 1958), affirmed 358 U.S. 68, 79 S.Ct. 107, 3 L. Ed.2d 34 (1958).

The Interstate Commerce Act § 3(4) requires that

"All carriers subject to the provisions of this chapter shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines and connecting lines, and for the receiving, forwarding, and delivering of passengers or property to and from connecting lines; and shall not discriminate in their rates, fares, and charges between connecting lines, or unduly prejudice any connecting line in the distribution of traffic that is not specifically routed by the shipper." 49 U.S.C. § 3(4) (1964).

A decision of the Commission in 1911 described the obligations of the railroads more fully:

"Reading these provisions together, there can be no doubt as to the intent of Congress. Our railroads are called upon to so unite themselves that they will constitute one national system; they must establish through routes, keep these routes open and in operation, furnish the necessary facilities for transportation, make reasonable and proper rules of practice as between themselves and the shippers, and as between each other. The full burden of this great obligation is in the first instance cast upon the carriers themselves. In compliance with these recognized requirements of the law the carriers have undertaken to establish a body of rules and by cooperation in their enforcement insure the fulfillment of the law's demands. The duty of the initial carrier to furnish equipment for a shipment which moves on to other lines is universally recognized, and in cases where that is impracticable or deemed unwise the carriers assume to bear the burden of the transfer from the equipment of one line to that of the other. * * *" Missouri & Illinois Coal v. I.C.R.R. Co., 22 ICC 39, 46–47 (1911).

As a result of these regulations, all railroads are required to establish reasonable through routes, and to accept, interchange, and transport all freight cars tendered to them in good operating condition. A company will often lose control of its car immediately upon delivery to an interchange for through transportation. After a car leaves the owning road's possession in the interchange, it may, as a result of shippers' orders made while enroute, be diverted to a new destination, entirely different from that to which it was originally directed, and outside the car owner's knowledge. After the car has been unloaded at its final destination, it may properly be reloaded by the destination railroad for further transportation elsewhere. This subsequent reloading and transportation is done without the owning road's knowledge, pursuant to the statutory requirement that all roads must facilitate transportation in the national public interest. The result is that the car owning road loses control of its car once it passes from its own line and it generally has neither knowledge of nor control over the car's location or destination.[1]

1. Two exceptions must be noted to this statement. First, to facilitate per diem rental billings some railroads report to the owner lines regularly which cars are on their tracks, so that in time the owner has an idea where his cars are. Second, specially-equipped cars are often exempted from the free interchange and

Each railroad is required to pay a regulated fee for its use of another road's cars. This fee, a "per diem," is prescribed by the Railway Accounting Rules, Rule 7. See generally Baltimore & Ohio R. Co. v. New York, New Haven and Hartford R.R., 196 F.Supp. 724 (S. D.N.Y. 1961); Palmer v. United States, 75 F.Supp. 63 (D.D.C. 1947). Forty days after a car has been used by another line, the owner learns two facts about his cars—which railroad used the car and how many days it was used. The owner does not discover, however, where and in what states the car has been used. For example, although a road may learn by May 10th that one of its cars was used for 14 days in March by the Penn Central Railroad, it has no way of knowing whether the car was used in New York, Connecticut or Ohio.

RF&P may indeed have freight cars present in New York every day and, if so, it would eventually receive a fee for the use of such cars, but I fail to see how RF&P is purposefully and significantly engaging in economic activity in this state when it has no knowledge of the fact that its cars are or were present in New York, and it cannot under the law possibly prevent the use of its cars in any state whatsoever.

The second "purposeful" activity relied upon by the majority and the district court is the fact that passengers may purchase coupon tickets in New York from connecting carriers covering passage on RF&P's tracks and for which RF&P is eventually reimbursed. The issuance or purchase of a through ticket in New York does not indicate any purposeful activity in New York by RF&P. It is required of RF&P, and of all railroads, that they publish a tariff schedule and abide by the rates listed therein. The ticketing carrier in New York, by combining the local rates, arrives at a sum for the entire journey. Consequently the passenger pays only once rather than having to purchase a separate ticket for each portion of the trip. The ticketing carrier subsequently pays the local carrier the appropriate amount. The local carrier, in this case RF&P, plays a passive role in the process and does not engage in such activities in New York as to subject to it personal jurisdiction.

In this case the district court found that RF&P did not affirmatively solicit passenger traffic from the public nor do other railroads do so on its behalf. The ticketing arrangement described in the majority opinion is not unusual, and the district court acknowledges that RF&P tickets can be bought not only in New York but at any rail ticket office in the country. If the mere fact that RF&P (and presumably every railroad in the country) allows through tickets to be sold at ticket offices across the country is sufficient to support a finding that RF&P is engaging in significant and purposeful economic activity in New York of such a nature as to subject it to full *in personam* jurisdiction, then under the prevailing opinion virtually every railroad in the country is subject to personal jurisdiction in New York.

I also disagree with the majority that personal jurisdiction is properly asserted under New York law. In my view, neither Frummer v. Hilton Hotels Int'l Inc., 19 N.Y.2d 533, 281 N.Y.S.2d 41, 227 N.E.2d 851 (1967) nor Gelfand v. Tanner Motor Tours Ltd., 385 F.2d 116 (2nd Cir. 1967), cert. denied, 390 U.S. 996, 88 S.Ct. 1198, 20 L.Ed.2d 95 (1968) is controlling. In both *Gelfand* and *Frummer* there was extensive purposeful activity in New York by representatives of the foreign corporation. In both cases the representatives were voluntarily assigned to New York in a conscious effort by the parties to tap the large New York market. The purpose of Credit Corporation's operations in New York in *Frummer, supra,* was to generate business for the Hilton chain. RF&P, however, has made no such affirmative efforts to do

use practice. The owner either tries to route entirely on his own tracks or else notifies the interchange lines that the

special car is to be returned empty to the owner when unloaded at the routed destination.

passenger business in New York; its only "presence" is one New York resident soliciting freight. See Miller v. Surf Properties, Inc., 4 N.Y.2d 475, 176 N.Y.S.2d 318, 151 N.E.2d 874 (1958). Unlike *Gelfand* and *Frummer,* RF&P has not employed agents to solicit passenger business in New York. RF&P's activities are the minimum required by statute, no more. Under these circumstances, I do not believe that RF&P has engaged in purposeful activity in New York.

In sum, the majority holds that one New York resident soliciting freight business is sufficient activity to subject RF&P to *in personam* jurisdiction to answer a claim arising out of its passenger business. There are simply no other affirmative or purposeful acts by RF&P in this jurisdiction. RF&P's contacts in New York are not extensive and do not result in the expenditure of money, time or effort within the state, see *Blount, supra.* Neither the presence of freight cars nor the sale of through tickets, both without affirmative participation by RF&P, is sufficient to constitute the minimal contacts necessary to sustain jurisdiction.

I would reverse the orders of the district court with directions to dismiss the complaint against RF&P.

Before LUMBARD, Chief Judge, WATERMAN, Senior Circuit Judge,* and MOORE, FRIENDLY, SMITH, KAUFMAN, HAYS, ANDERSON and FEINBERG, Circuit Judges.

*On Reconsideration in Banc*

FRIENDLY, Circuit Judge (with whom WATERMAN, MOORE, SMITH, and ANDERSON, Circuit Judges, join):

We granted rehearing *in banc* on the basis of a petition wherein defendant asserted that the panel decision affirming the district court's refusal to quash the service of process would have the practical effect of subjecting every railroad of any importance to suit in any state where it engaged in freight solicitation.[1] Further consideration shows that affirmance does not entail any such broad holding.

The RF&P relies not merely on the Due Process clause of the Fourteenth Amendment but also on a line of Commerce Clause decisions beginning with Davis v. Farmers' Co-operative Equity Co., 262 U.S. 312, 317–318, 43 S.Ct. 556, 67 L.Ed. 996 (1923).[2] That decision invalidated a judgment, predicated on a claim unrelated to Minnesota, the forum state, against the Atchison, Topeka & Santa Fe Ry., a foreign corporation which conducted no physical operations in Minnesota but did engage in traffic solicitation by a local agent.[3] The Court held that the purported assertion of *in*

---

* Judge Waterman was an active circuit judge at the time the court undertook *in banc* consideration of this case.

1. This was said to follow because the panel opinion had listed three factors as constituting defendant's activities in New York: (1) freight solicitation, here rather modest in amount; (2) sale and issuance by connecting railroads of coupon tickets and through bills of lading good for carriage over defendant's line; and (3) daily presence in New York of RF&P freight cars in trains operated by connecting railroads. The two latter elements would exist in almost every state with respect to any major railroad, and the first in many.

2. The line continued with Atchison, Topeka & Santa Fe Ry. v. Wells, 265 U.S. 101, 44 S.Ct. 469, 68 L.Ed. 928 (1924);

Missouri ex rel. St. Louis, B. & M. Ry. v. Taylor, 266 U.S. 200, 207, 45 S.Ct. 47, 69 L.Ed. 247 (1924); Hoffman v. Missouri ex rel. Foraker, 274 U.S. 21, 47 S.Ct. 485, 71 L.Ed. 905 (1927); Michigan Central R.R. v. Mix, 278 U.S. 492, 49 S.Ct. 207, 73 L.Ed. 470 (1929); Denver & Rio Grande Western R.R. v. Terte, 284 U.S. 284, 52 S.Ct. 152, 76 L. Ed. 295 (1932); and International Milling Co. v. Columbia Transp. Co., 292 U.S. 511, 54 S.Ct. 797, 78 L.Ed. 1396 (1934).

3. While the opinion does not say so, the Santa Fe's solicitors or shippers in Minnesota obviously caused other railroads to issue through bills of lading over the lines of the Santa Fe, and Santa Fe freight cars must have been in Minnesota as they are in almost every state.

*personam* jurisdiction over the railroad imposed an unreasonable burden on interstate commerce and did not reach the question whether it denied due process. This court recognized the continuing vitality of these decisions only a few years ago, Buckley v. New York Post Corp., 373 F.2d 175, 183–184 (1967), as the American Law Institute's Restatement of the Conflict of Laws 2d, Proposed Official Draft, Part I, p. 221 (1967), has also done. International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) in no way intimated that they were being overruled, and the present financial condition of the nation's railroads does not suggest a lesser need for protection against harassing litigation than existed in 1923. We hold rather that not only the requirements of due process but such higher standards as the Commerce Clause may entail were satisfied by the presence in this case of elements in addition to those listed in the panel opinion's description of defendant's New York activities, to wit, Mrs. Scanapico's New York residence, the regular operation of through passenger trains over the RF&P from and to New York City, and the extensive sale in New York of tickets for these trains.

The action in *Davis* was brought in Minnesota by a Kansas corporation against a railroad incorporated in Kansas for loss of grain shipped between two points in Kansas under a bill of lading issued in that state. In invalidating the judgment under the Commerce Clause, Mr. Justice Brandeis expressed the caveat, 262 U.S. at 316–317, 43 S.Ct. at 558:

> It may be that a statute like that here assailed would be valid although applied to suits where the cause of action arose elsewhere, if the transaction out of which it arose had been entered upon within the state, or if the plaintiff was, when it arose, a resident of the state.

The first case testing the latter branch of the caveat was Missouri ex rel. St. Louis, B. & M. Ry. v. Taylor, 266 U.S. 200, 45 S.Ct. 47, 69 L.Ed. 247 (1924). The American Fruit Growers, Inc., a Delaware corporation with a "usual place of business" in Missouri, brought an action in that state against the St. Louis, Brownsville & Mexico Railway for damages to freight originating in Texas on defendant's lines. Jurisdiction was obtained by garnishment of traffic balances due from a connecting interstate carrier having a place of business in Missouri. In upholding the jurisdiction of the Missouri court, Mr. Justice Brandeis, speaking for the Court, distinguished *Davis* on the grounds that

> [h]ere, the plaintiff consignee is a resident of Missouri,—that is, has a usual place of business within the state; the shipment out of which the cause of action arose was of goods deliverable in Missouri; and, for aught that appears, the negligence complained of occurred within Missouri. To require that, under such circumstances, the foreign carrier shall submit to suit within a state to whose jurisdiction it would be amenable by process of attachment does not unreasonably burden interstate commerce.

266 U.S. at 207, 45 S.Ct. at 48.

In International Milling Co. v. Columbia Transp. Co., 292 U.S. 511, 54 S.Ct. 797, 78 L.Ed. 1396 (1934), the Court dealt more extensively with the legal import of plaintiff's residence when a state asserts jurisdiction over an interstate carrier. This was an action by a foreign corporation having its principal office in Minnesota, the state of suit, against a Delaware organized steamship company with its principal office in Cleveland, Ohio. Its ships plied the Great Lakes and their tributaries and frequently touched at a Minnesota port, where it employed a firm of brokers to handle the vessels and their cargoes.[4]

---

4. Jurisdiction was obtained by attaching a ship arriving at Duluth.

After noting that the plaintiff was in effect a resident, "a fact of high significance"[5] but not conclusive, Mr. Justice Cardozo said the "next inquiry must be whether there is anything in the nature of the activities of the defendant to overcome its force." 292 U.S. at 519–520, 54 S.Ct. at 799–800. He concluded there was not, since "the defendant, though an interstate carrier, does not do business like a railroad company along a changeless route" but, on the contrary, "is engaged in transportation in Minnesota as much as it is engaged in transportation anywhere, if we exclude the activities of management that have their center in Ohio," 292 U.S. at 519–520, 54 S.Ct. at 800. Cf. Barnett v. Texas & P. Ry., 145 F.2d 800, 804 (2 Cir. 1944);[6] Moss v. Atl. C. L. R. R., 157 F.2d 1005, 1007 (2 Cir. 1946).[7] Compare Erlanger Mills, Inc. v. Cohoes Fibre Mills, Inc., 239 F.2d 502, 507 (4 Cir. 1956); Southern Machine Co. v. Mohasco Industries, Inc., 401 F.2d 374, 377–378 n. 6 (6 Cir. 1968); Georgia v. City of Chattanooga, Tenn., 406 F.2d 830, 833 (6 Cir. 1969).

Since Mrs. Scanapico is a New York resident, she, like the plaintiffs in *Taylor* and *International Milling*, does not at all bear the aspect "of an impertinent intruder," 292 U.S. at 519, 54 S.Ct. 797, 78 L.Ed. 1396, when she invokes the aid of a New York court. The RF&P contends this factor favorable to the plaintiff is overcome since it fits Mr. Justice Cardozo's description of "a railroad company" doing business "along a changeless route" between Washington D. C. and Richmond, Va. But, even if we were to regard this dictum as limiting *Taylor* to its facts, the RF&P's route is more aptly characterized as one having a peculiarly intimate relation with New York. For as long as any of us can remember, and as counsel conceded at argument, through trains have operated from the Pennsylvania Station in New York City over what is now the Penn Central to Washington, the RF&P to Richmond and the Seaboard Coast Line (and its earlier two components) beyond to Florida, and *vice versa*. Indeed, it was on such a train that Mrs.

---

5. We have recently stressed the importance of plaintiff's residence in overcoming a defendant's claim of denial of due process. Minichiello v. Rosenberg, 2 Cir., 410 F.2d 106 (1968), on rehearing in banc, 410 F.2d 117, 120 (concurring opinion of Judge Hays) (1969), cert. denied, 396 U.S. 844, 90 S.Ct. 69, 24 L.Ed.2d 94 (1969); Farrell v. Piedmont Aviation, Inc., 2 Cir., 411 F.2d 812, 816–817, cert. denied, 396 U.S. 840, 90 S.Ct. 103, 24 L.Ed.2d 91 (1969).

6. In *Barnett*, we reversed a lower court judgment dismissing a personal injury action for want of personal jurisdiction over an interstate railroad which operated only in Texas, Louisiana and Arkansas, though it had an office in New York which solicited freight and passenger service and had authority to issue bills of lading for shipments on its lines. The alleged injury occurred in Texas. In rejecting the argument that the suit imposed an undue burden on interstate commerce, we emphasized the significance of plaintiff's New York residence.

7. In *Moss*, we upheld, over Commerce Clause objections, the assertion of jurisdiction by New York courts over an interstate railroad with its principal place of business in North Carolina, with no tracks of its own north of Richmond and Norfolk, and which, like the RF&P, ran through trains from Florida to New York City that were operated—north of its own lines—on the tracks and by the crews of other railroads. The injury to the passenger occurred in North Carolina. Two factors not present in the instant case were plaintiff's out-of-state residence on the one hand, and the more substantial in-state activities of the defendant— it had executive, passenger, and freight offices in New York on the other. We there noted that *International Milling* had effectively limited *Davis* to its facts and that

> [a]s the defendant is doing business in the Southern District of New York in a way to make it amenable to process in the New York courts and acts there in concert with other carriers to run what are called through trains between New York City and Florida and intermediate points, a suit triable in New York based upon the negligent operation of one or more of those trains does not, we think, unduly burden interstate commerce.

157 F.2d at 1007.

Scanapico was injured. While this injury occurred when the train was moving over the RF&P's tracks and was being operated by its crews, these facts meant nothing to her, if indeed she realized them at all. Similarly, the Penn Central's regular sales in New York of coupon tickets on these through trains from its New York City station over the RF&P and return and the extensive advertising of these trains in New York, particularly by the southern carriers, have a significance for the RF&P quite different from an occasional sale of a coupon over some part of the route of a transcontinental railroad having no through train service from or to New York. If Mrs. Scanapico had bought her ticket in New York, it could hardly be argued that the Commerce Clause prevented her suing the RF&P here for an injury occurring on its line. The burden on commerce in defending the suit in New York is no greater because the ticket was bought in Florida. Cf. Moss v. Atl. C. L. R. R., *supra*.

■ Since the RF&P's activities in New York sufficed to render the maintenance of this action permissible under the Commerce Clause, they satisfied *a fortiori* the requirements of the Due Process Clause of the Fourteenth Amendment. The only remaining question—logically, of course, it should be the first one—is whether New York has chosen to make the RF&P subject to its process. Here the difference between the hypothetical case of the New York purchased ticket and the actual case of the Florida purchased one becomes important since New York's long-arm statute, CPLR § 302(a), covers only "a cause of action arising from any of the acts" there enumerated and Mrs. Scanapico's is not one of them. She must therefore rely on the RF&P's being "present" or "doing business" under § 301 which provides that "[a] court may exercise such jurisdiction over persons * * * as might have been exercised heretofore." Although we have recently expressed doubt whether Frummer v. Hilton Hotels International, Inc., 19 N.Y.2d 533, 281 N.Y.S. 2d 41, 227 N.E.2d 851, cert. denied, 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967), goes as far as some of its language, see Aquascutum of London, Inc. v. S.S. American Champion, 2 Cir., 426 F.2d 205, 212 (1970), the Penn Central's sales of tickets for the through trains regularly operated from and to New York over the RF&P, along with the RF&P's freight solicitation, bring that carrier within the rationale of Frummer and our application of it in Gelfand v. Tanner Motor Tours, Ltd., 2 Cir., 385 F.2d 116 (1967), cert. denied, 390 U.S. 996, 88 S.Ct. 1198, 20 L.Ed.2d 95 (1968).

The order denying the motion to quash the service of process is affirmed.

IRVING R. KAUFMAN, Circuit Judge (concurring):

I concur in the result reached in Judge Friendly's opinion. I express no view, however, on the relative stringency of the commerce and due process clauses as applied to this case, and on whether a different result would prevail in the absence of through train connections.

HAYS, Circuit Judge (concurring in the result):

I concur in the result but differ with the majority's view that jurisdiction can be asserted only because plaintiff is a resident of New York.

The majority has resurrected a whole battery of cases dating from thirty-five to fifty years ago in order to materialize the ghost of a long-outmoded view of "burden on interstate commerce." As the majority opinion of the panel said:

"The cases which appellant cites hark back to earlier days and reflect a far less fully developed stage of our national economy. In McGee v. International Life Insurance Co., [355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957)] the Court said at p. 223:

'* * * modern transportation and communication have made it much

less burdensome for a party sued to defend himself in a State where he engages in economic activity.' *

In the *Frummer* case the New York Court of Appeals said:

'We are not unmindful that litigation in a foreign jurisdiction is a burdensome inconvenience for any company. However, it is part of the price which may properly be demanded of those who extensively engage in [interstate] trade. When their activities * * * either directly or through an agent, become as widespread and energetic as the activities in New York conducted by [defendant], they receive considerable benefits from such * * * business and may not be heard to complain about the burdens.' Frummer v. Hilton Hotels Internat'l, Inc., 19 N.Y.2d at 538, 281 N.Y.S.2d at 45 [227 N.E.2d 851]."

Once the ghost of these ancient cases has been laid there is no difficulty about asserting jurisdiction whether or not plaintiff is a resident, as is amply demonstrated in the majority opinion of the panel.

FEINBERG, Circuit Judge, joins in this opinion.

LUMBARD, Chief Judge (dissenting):

Although Judge Friendly's opinion seems somewhat to narrow the reach of Southern District jurisdiction for New York residents buying railroad tickets in New York, I doubt that the distinction as to whether the train is a through train is viable. I am of the view that this distinction will quickly be brushed aside, especially since through passenger trains may soon be as extinct as the dodo. Indeed, the concurring opinions of Judges Kaufman and Hays imply that they may not accept the distinction.

While it is doubtful whether what we now call "passenger traffic" is to continue beyond metropolitan areas in the future, it seems to me to be a needless and inadvisable burden on railroads to be required to bring numerous witnesses to New York to contest cases such as this. It is hardly an answer to say that the district court can always transfer the case to the district where the operative events occurred under 28 U.S.C. § 1404 (a). In practice, we all know that judges very rarely transfer such cases over the objections of plaintiffs and their counsel, regardless of the balance of convenience.

For these reasons, and the reasons set forth in my opinion which dissented from the panel opinion, reported at 439 F.2d 21, I dissent and vote to reverse the judgment and dismiss the complaint.

---

\* Whether some other forum may be more convenient for trial is not before us. Presumably defendant will be able to move for transfer to another forum under 28 U.S.C. § 1404(2) (1964).